No. 21-2644

IN THE

**United States Court of Appeals for the Seventh Circuit**

_____

JOSE AGEO LUNA VANEGAS, individually and on
behalf of other similarly situated individuals,

*Plaintiff-Appellant,*

v.

SIGNET BUILDERS, INC.,

*Defendant-Appellee*.

_____

On Appeal from the United States District Court
For the Western District of Wisconsin
Case No. 21-cv-54

_____

**BRIEF OF CENTRO DE LOS DERECHOS DEL MIGRANTE,
ECONOMIC POLICY INSTITUTE, SHRIVER CENTER ON POVERTY LAW,
NATIONAL EMPLOYMENT LAW PROJECT AS AMICI CURIAE
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

_____

Catherine K. Ruckelshaus
Brian Chen
National Employment Law Project
90 Broad Street, Suite 1100
New York, NY 10004
(646) 693-8221
cruckelshaus@nelp.org
bchen@nelp.org

*Counsel for* Amici Curiae

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2644

Short Caption: Luna Vanegas v. Signet Builders, Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Centro de los Derechos del Migrante, Economic Policy Institute, Shriver Center on Poverty Law,

National Employment Law Project, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

n/a

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

n/a for all amici

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a for all amici

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Catherine Ruckelshaus    Date: 12-7-21

Attorney's Printed Name: Catherine Ruckelshaus

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ✓    **No** ☐

Address: 90 Broad Street, Suite 1100

New York, NY 10004

Phone Number: 693-646-8221    Fax Number: 212-285-3044

E-Mail Address: cruckelshaus@nelp.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>21-2644</u>

Short Caption: <u>Luna Vanegas v. Signet Builders, Inc.</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Centro de los Derechos del Migrante, Economic Policy Institute, Shriver Center on Poverty Law,</u>

<u>National Employment Law Project.</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>n/a</u>

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

      <u>n/a</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      <u>n/a</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>n/a</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>n/a</u>

Attorney's Signature:   *Brian Chen*     Date: <u>12/3/21</u>

Attorney's Printed Name: <u>Brian Chen</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: <u>90 Broad St, Ste 1100</u>

<u>New York, NY 10004</u>

Phone Number: <u>646-693-8212</u>     Fax Number: _____

E-Mail Address: <u>bchen@nelp.org</u>

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………ii

INTEREST OF AMICI CURIAE………………………………………….……1

SUMMARY OF ARGUMENT…………………………………………………3

ARGUMENT……………………………………………………………………5

    I.    The construction of massive, highly sophisticated livestock confinement buildings is not agriculture. It is an independent productive activity organized separately from farming, and companies engaged in that work should not be able to claim an agricultural overtime exemption that their customers could claim………………………………………………...5

    II.    A finding that Signet's construction workers qualify for the agricultural laborer exemption would defeat the spirit and intent of the FLSA……...9

    III.    Overtime protections are critical to the economic well-being, as well as the health and safety, of contracted construction workers like the Plaintiff in this case……………………………………………………………11

        A. Construction companies like Signet are increasing their use of H-2A visas and not paying overtime to the immigrant workers they recruit and hire, exacerbating the impact of underpaying and overworking employees………………………………………………………...11
        B. Overtime protections are meant to provide economic security and health and safety……………………………………………………16

    IV.    Overtime protections spread work, helping to reduce unemployment ……………………………………………………………………19

CONCLUSION………………………………………………………………….20

# TABLE OF AUTHORITIES

**Cases**

*A.H. Phillips, Inc. v. Walling*, 324 U.S. 490 (1945) .................................................10

*Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755 (1949) ..................5

*Holly Farms Corp. v. NLRB*, 517 U.S. 392 (1996) .....................................................9

*Lehigh Valley Coal Co. v. Yensavage*, 218 F. 547 (2d Cir. 1915)............................10

*Maneja v. Waialua Agricultural Co., Ltd.*, 349 U.S. 254 (1955) ..........................5, 6

*Mitchell v. Hunt*, 263 F.2d 913 (5th Cir. 1959) ..........................................................5

*MRL Fencing and Construction [I]*, 2012-TLN-00042 (U.S. Dep't of Labor Bd. of Alien Labor Cert. Appeals Aug. 8, 2012)................................................................8

*NLRB v. Monterey Cnty. Bldg. & Constr. Trades Council*, 335 F.2d 927 (9th Cir. 1964) ...............................................................................................................................8

*Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942) ...............................19

*Rutherford Food Corp. v. McComb,* 331 U.S. 722 (1947)......................................10

*Sec'y of Labor v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1987) ...................................10

*U.S. v. Rosenwasser*, 323 U.S. 360 (1945) ...............................................................10

*Wirtz v. Tyson's Poultry*, 355 F.2d 255 (8th Cir. 1966) ...........................................7

**Statutes**

29 U.S.C. § 202(a). ......................................................................................................16

29 U.S.C. § 203 ..................................................................................5

Fair Labor Standards Act, 29 U.S.C. 201 *et seq* .......................................3

**Other Authorities**

A.E. Dembe et al., *The impact of overtime and long work hours on occupational injuries and illness: new evidence from the United States*, 62 J. OCCUPATIONAL & ENVIRONMENTAL MEDICINE 588 (2005) ..............................................................17

Catherine Ruckelshaus and Rebecca Smith, *Who's the Boss: Restoring Accountability for Labor Standards in Outsourced Work*, National Employment Law Project (May 7, 2014) ..................................................................11

Daniel Costa, Philip Martin and Zachariah Rutledge, *Federal Labor Standards Enforcement in Agriculture*, Economic Policy Institute (Dec. 15, 2020) ............13

Daniel Costa, *The farmworker wage gap continued in 2020*, Economic Policy Institute (July 20, 2021) ........................................................................13

David Weil, *The Fissured Workplace: Why Work Became So Bad for So Many and What Can Be Done to Improve It* (2017)..............................................................11

Deborah C. Malamud, *Engineering the Middle Classes: Class Line-Drawing in New Deal Hours Legislation*, 96 U. MICH. L. REV. 2212 (1998) ........................19

*H-2A Continues to Expand*, Rural Migration News (Nov. 19, 2021) ....................12

Heidi Shierholz, *Federal overtime pay bill would boost paychecks by $1.2 billion annually*, Economic Policy Institute (Dec. 1, 2017)............................................16

*Home | Signet US*, https://www.signet.us/ ..............................................................6

Linda M. Goldenhar, et al., *The ''Goldilocks model'' of overtime in construction: not too much, not too little, but just right*, 34 J. SAFETY RESEARCH 215 (2003)..18

Maurizio Guerrero, *The return of the construction industry has brought a surge of immigrant worker deaths,* In These Times (Aug. 13, 2020) ................................17

Occupational Safety and Health Administration, *Construction Industry*................17

*Safety training falls short for immigrant workers at small construction companies,* Safety and Health Magazine (May 21, 2018)........................................................18

Shereen Lehman, *Construction workers still at high risk for strains and sprains*, Reuters (Jan. 16, 2017) ...........................................................................................18

Shirley Lung, *Overwork and Overtime*, 39 IND. L. REV. 51 (2005) .....................17

*SIGNET: Overview | LinkedIn* ...................................................................................7

U.S. Dep't of Agriculture, *Animal Production | USDA* ............................................7

**Rules**

Federal Rule of Appellate Procedure 29 .....................................................................1

Local Circuit Rule 29.1 ...............................................................................................1

## INTEREST OF AMICI CURIAE

Amici are workers' rights and economic security organizations with ties to Seventh Circuit states and with a stake in the outcome of this case. Amici write not to repeat arguments made by the parties, but to illustrate the importance of understanding the vertical disintegration of the business engaging the Plaintiff and workers like him, and to describe the implications of failing to provide overtime protections to immigrant and underpaid workers. Amici submit this brief with the consent of all parties and pursuant to Federal Rule of Appellate Procedure 29 and Local Circuit Rule 29.1. No party's counsel authored the brief in whole or in part, and no party, party's counsel, or any other person contributed money that was intended to fund preparing or submitting the brief.

Centro de los Derechos del Migrante, Inc. (CDM, or the Center for Migrant Rights) is a U.S. section 501(c)(3) migrant workers' rights organization with offices in Baltimore, Maryland; Mexico City; and Oaxaca, Mexico. CDM's mission is to improve the working conditions of migrant workers throughout the U.S. through litigation, policy advocacy and community education. The H-2A workers whose stories CDM helps bring to light experience pervasive violations of their labor rights, from the illegal fees they are charged during recruitment abroad through the wages they are shorted in U.S. workplaces. Many work extremely long hours for subminimum wages. As an organization that seeks to eradicate these

abuses, CDM has a substantial interest in ensuring that workers like those in this case receive the overtime wages they are due under federal law.

The Economic Policy Institute (EPI) is a non-profit organization with 35 years of experience analyzing the effects of economic policy on the lives of American's working families. EPI has studied and produced extensive research on the economic implications of wage and hour issues under the Fair Labor Standards Act. This research includes work on the importance of overtime protections to ensure that workers are paid fairly and not overworked, and this research informs our position in this case. Undermining overtime protections has serious consequences for both workers and our economy. EPI has also researched, written, and commented extensively on the U.S. system for labor migration, through public comments, publications, and testimony—including, with particular respect to U.S. immigrant and nonimmigrant visas, the H-2A visa program—as well as on the protection of labor standards in the agricultural industry. In addition, EPI has participated as amicus curiae in numerous cases impacting workers' rights under federal and state wage and hour laws. EPI strives to protect and improve the economic conditions of all working people, regardless of immigration status. EPI is concerned that all employees enjoy the full protections of wage and hour laws.

The Shriver Center on Poverty Law (Shriver Center) is an over-50-years-old non-profit legal organization that fights for economic and racial justice. The

Shriver Center strives to ensure that low-wage workers in Illinois have basic workplace protections. Throughout its history, the Shriver Center has worked to enforce the rights of low-wage workers in Illinois, through direct legal representation, policy, and administrative advocacy.

The National Employment Law Project (NELP) is a non-profit legal organization with over 50 years of experience advocating for the employment and labor rights of underpaid and unemployed workers. NELP seeks to ensure that all employees, and especially the most vulnerable ones, receive the full protection of labor laws, and that employers are not rewarded for skirting those basic rights. NELP collaborates closely with membership-based organizations throughout the Seventh Circuit states. NELP has litigated directly and participated as amicus in numerous cases and has provided Congressional testimony addressing the coverage of provisions of the Fair Labor Standards Act.

## SUMMARY OF ARGUMENT

Defendant Signet Builders, a Texas-based construction company, sought work to construct livestock confinement buildings for farms in Wisconsin and Indiana, among other states, and hired Plaintiff Luna Vanegas to do the work. Mr. Luna Vanegas worked long hours and was not paid overtime. Defendant claims an agricultural worker exemption from overtime under the Fair Labor Standards Act, 29 U.S.C. 201 *et seq* (FLSA or the Act), but Mr. Luna Vanegas was not engaged in

agricultural work under the definition and application of the exemption. The district court granted Defendant's motion to dismiss without any factual development of the relationship between the Defendant construction company, any other construction companies, and the farm that needed the livestock buildings, and thus the result cannot be correct.

The FLSA was enacted with an understanding of how subcontracting works. The Act is designed to scrutinize evolving business contracting arrangements to ensure that its exemptions are properly applied, and to prevent businesses from evading its protections. Here, the Defendant seeks an agricultural laborer exemption that cannot be claimed given the separate and independent organization of the work performed by Plaintiff and other workers like him.

In addition, workers like Mr. Luna Vanegas are precisely the workers the FLSA was intended to protect. He is a new immigrant, recruited to work in dangerous and low-paid construction jobs for long hours. Without overtime protections, employers like Signet have little incentive to hire additional workers to avoid overwork and often will underbid competing companies that do pay overtime. This can lead to dismal poverty wages and worsen unsafe conditions in construction jobs like the ones Mr. Luna Vanegas performed. For these broader economic and policy reasons, the Court should reverse the district court's ruling and remand for further proceedings with a full factual accounting.

# ARGUMENT

I. **The construction of massive, highly sophisticated livestock confinement buildings is not agriculture. It is an independent productive activity organized separately from farming, and companies engaged in that work should not be able to claim an agricultural overtime exemption that their customers could claim.**

The case law on the limited application of the Fair Labor Standards Act's agricultural exemption is well-settled. *See Maneja v. Waialua Agricultural Co., Ltd.*, 349 U.S. 254, 265 (1955) (noting that the question whether workers fall within the agricultural exemption to the FLSA "is a limited one"). Aside from the primary definition of agriculture—which the parties agree is not in dispute—the question is whether Signet's workers' activities were performed "on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." 29 U.S.C. § 203. Interpreting the text of the FLSA, the U.S. Supreme Court has clarified that the key question to assess the scope of the agricultural exemption is "whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity." *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 761 (1949); *see also Mitchell v. Hunt*, 263 F.2d 913, 917 (5th Cir. 1959) ("A basic factor for determining what practices are incident to or performed in conjunction

with a farmer's farm operations is whether the practices are among those ordinarily, customarily, or usually performed by a farmer or on a farm.").

Here, Plaintiff Luna Vanegas, working for Signet, built livestock confinement buildings. The buildings are huge, technologically advanced, and sophisticated.[1] Certainly, they facilitate, and may well be necessary for, the kind of modern, large scale, commercial hog production that has made meat and poultry the largest section of U.S. agriculture. Even so, this advanced construction is an independent productive activity that is separately organized from farming; it does not belong within an exemption that applies "only to agriculture." *Maneja*, 349 U.S. at 260.

Luna Vanegas and his fellow workers' highly sophisticated construction, well beyond the capacities of any ordinary or extraordinary farmer, is precisely the kind of division of labor described by the U.S. Supreme Court's assessment of the scope of the agricultural exemption in an advanced economy. *Farmers Reservoir*, 337 U.S. at 761. The production and distribution of pork in the modern U.S. economy is no small operation. The United States is the second-largest pork producer and a major player in the world pork market, ranking second as both an

---

[1] *See Home | Signet US*, https://www.signet.us/ (last visited Nov. 30, 2021) (describing its activities including "erecting half a million square foot buildings in the heartland," featuring photos and videos of massive confinement buildings, and advertising that there is "no job too big").

importing and exporting country.[2] The construction of massive livestock confinements may well be "necessary to the total economic process of supplying" pork to market, yet "in the process of economic development and specialization," the activity becomes a "separate and independent productive function[] operated in conjunction with the agricultural function but no longer a part of it." *Farmers Reservoir*, 337 U.S. at 761.

Signet is a major construction employer that contracts to do business with all kinds of companies, within and without agriculture. The company's LinkedIn profile describes it working on "projects of all sizes and scopes, but primarily on large scale projects such as assisted living facilities, military housing, industrial plants, and of course, agricultural buildings."[3] Beyond the terms of its contracts with specific growers, Signet neither profits nor suffers losses based on, say, fluctuations in the market price of pork. *See Wirtz v. Tyson's Poultry*, 355 F.2d 255, 259 (8th Cir. 1966) (finding that employees of an egg processing and marketing corporation were "agricultural laborers" because, in the event the agricultural stock failed, the loss would be felt by the corporation).

---

[2] U.S. Dep't of Agriculture, *Animal Production | USDA*, https://www.usda.gov/topics/animals/animal-production (last visited Nov. 30, 2021).
[3] *SIGNET: Overview | LinkedIn*, https://www.linkedin.com/company/signet-builders-inc/ (last visited Nov. 30, 2021).

Signet contracts with other businesses to provide specialized industrial construction of technologically advanced animal confinement buildings as a separately organized and independent productive activity, the size and scale of which surpass the capacities of even the most hands-on, do-it-yourself farmer in an economically advanced society. The fact that the activity is physically occurring on a farm—or more to the point, on property that will, upon the completion of construction, become a farm—is insufficient to exempt Plaintiff Luna Vanegas from overtime pay as an agricultural laborer. *See NLRB v. Monterey Cnty. Bldg. & Constr. Trades Council*, 335 F.2d 927, 931 (9th Cir. 1964) ("Can [construction workers] be said to lose [employee] status and become "agricultural laborers" because the construction project undertaken happens to form the basis for a farm? It does not appear to us that this construction of the Act would be consistent with the realities of our modern economy."); *see also MRL Fencing and Construction [I]*, 2012-TLN-00042 (U.S. Dep't of Labor Bd. of Alien Labor Cert. Appeals Aug. 8, 2012) ("[T]he Employer's construction and repair business appears to fall squarely within the type of independent business that the Department's FLSA regulations specifically exclude[.]"); *MRL Fencing and Construction [II]*, 2013-TLN-00054 (U.S. Dep't of Labor Bd. of Alien Labor Cert. Appeals June 21, 2013) (same) [*MRL I and II* available at Dkt. No. 40-3].

8

Based on the limited facts at this early stage of litigation, Defendant has not proved its defense, and Plaintiff should be able to prove that he performed construction work that was separately organized as an independent productive activity.

## II.    A finding that Signet's construction workers qualify for the agricultural laborer exemption would defeat the spirit and intent of the FLSA.

Aside from the legally-clear determination that Signet's construction workers are not engaged in work that is "incident to or in conjunction with . . . farming operations," the spirit and intent of the Fair Labor Standards Act make clear that the Act never intended to exclude this set of workers from its capacious and extensive worker protections. *See Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399 (1996) (applying the "agricultural laborer" analysis to the NLRA and noting that "reviewing courts must take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach").

The FLSA is intended to cover workers broadly. The U.S. Congress passed the Act during the Great Depression under conditions of runaway economic inequality similar to those the U.S. faces today, to guard against employer exploitation of workers, and to "lessen, so far as seemed then practicable, the distribution in commerce of goods produced under subnormal labor conditions[.]"

*Rutherford Food Corp. v. McComb,* 331 U.S. 722, 727 (1947); *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945). Its "suffer or permit to work" standard of coverage is "the broadest definition that has ever been included in any one act." *U.S. v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945) (quoting statement of Sen. Hugo Black, 81 Cong. Rec. 7657 (1938)). The purpose of the Act's broad definitions is to eliminate substandard labor conditions by expanding accountability for violations to include businesses that insert contractors in their business. *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1545 (7th Cir. 1987) (Easterbrook, J., concurring); *see also Lehigh Valley Coal Co. v. Yensavage*, 218 F. 547, 553 (2d Cir. 1915) (Judge Learned Hand noting that employment statutes were meant to "upset the freedom of contract").

If workers like Luna Vanegas are considered agricultural laborers exempt from the FLSA, unlawful companies seeking to shirk responsibility and labor costs have yet another incentive to weave webs of labor-degrading work structures—outsourcing, subcontracting, misclassifying, exempting—in an effort to escape foundational work standards and yet still cloak themselves in pay exemptions. If Signet's construction workers are exempt from the wage and overtime provisions of the Act as "agricultural laborers," so excluded too are many workers in a massive part of the U.S. economy, due only to a tangential relationship to livestock farming.

By abusing the agricultural laborer exemption, just like misclassifying workers or inserting temporary and staffing agencies and other types of subcontractors between themselves and workers, companies degrade work conditions and avoid liability for violations of workplace laws even as they benefit from and have the right to control the work itself. Labor typically represents a larger share of overall costs as subcontracting increases and is too often one of the only costs in direct control by subcontractors like Signet. This creates incentives to cut corners, leading to violations of the FLSA. Yet it is precisely these workers, down the chain of a fissured work relationship with no clear employer obligations, who are likely to work in underpaying, physically dangerous jobs.[4] These are the workers who most require the protections of the FLSA.

III. **Overtime protections are critical to the economic well-being, as well as the health and safety, of contracted construction workers like the Plaintiff in this case.**

A. **Construction companies like Signet are increasing their use of H-2A visas and not paying overtime to the immigrant workers they recruit and hire, exacerbating the impact of underpaying and overworking employees.**

---

[4] *See* Catherine Ruckelshaus and Rebecca Smith, *Who's the Boss: Restoring Accountability for Labor Standards in Outsourced Work*, National Employment Law Project (May 7, 2014), https://www.nelp.org/publication/whos-the-boss-restoring-accountability-for-labor-standards-in-outsourced-work/; David Weil, *The Fissured Workplace: Why Work Became So Bad for So Many and What Can Be Done to Improve It* (2017).

Seventh Circuit states Indiana, Illinois, and Wisconsin are three of the top

seven certified users of H-2A visas for agricultural construction work in Fiscal

Years 2018-2021.[5] Signet, including Signet Builders and Signet Construction, is

the number two employer in overall certified construction jobs in the H-2A

program, with 3,187 approved H-2A jobs from fiscal year 2018 up through

available data in 2021.[6] The employer with the most certified H-2A construction

jobs has 7,581 jobs certified during the same time period, and overall corporate use

of H-2As is increasing.[7] Construction companies' ongoing use of H-2A visas for

construction jobs increases the stakes of a holding in this case: more companies

can undercut and underbid companies paying overtime, and more workers can be

---

[5] NELP reviewed U.S. Department of Labor H-2A data for FY 2018-3[rd] quarter 2021, available at https://www.dol.gov/agencies/eta/foreign-labor/performance.

[6] *Id.* The USDOL data is not in a standard format, year-to-year. To identify the H-2A construction orders, all orders with the Standard Occupational Classification (SOC) in the 47 (Construction and Extraction Occupations) category were included. In addition, NELP manually reviewed all Wisconsin orders from FY 2018-3[rd] quarter FY 2021, to capture any jobs not using the SOC 47, and identified other orders in additional states using search terms such as "installers," "concrete," "construction," excavating" "builders," and "systems." NELP also identified each order that listed "construction" under crops and searched for orders of known H-2A construction firms, paying special attention to orders involving livestock, and manually reviewed orders when possible.

[7] *H-2A Continues to Expand*, Rural Migration News (Nov. 19, 2021), https://migration.ucdavis.edu/rmn/blog/post/?id=2672. The "number of workers certified" in the USDOL data is the number of workers approved under each job order. Because it is common for a single worker to work under multiple job orders in multiple states during a single calendar year, this number represents jobs, and not necessarily unique individual H-2A workers.

overworked and underpaid. In dangerous construction jobs, the consequences can be dire.

The Economic Policy Institute (EPI) estimates that there were upwards of 2.5 million workers working on farms in 2020 and more than 200,000 H-2A workers employed in the United States in 2019, representing roughly one-tenth of workers employed on U.S. crop farms.[8] Farmworkers earn very low wages, even compared to the lowest wage earners in the workforce, and often work long hours, as they are exempt from overtime protections.[9] Undocumented workers make up some of the workforce on farms, and both unauthorized and H-2A workers have limited labor rights and are vulnerable to wage theft and other abuses due to their immigration status.[10] The immigration status of farmworkers, fear of retaliation and deportation, and even the perception that the Department of Labor will not take action or will fail to obtain meaningful remedies all contribute to farmworkers not reporting

---

[8] Daniel Costa, Philip Martin and Zachariah Rutledge, *Federal Labor Standards Enforcement in Agriculture*, Economic Policy Institute (Dec. 15, 2020), https://www.epi.org/publication/federal-labor-standards-enforcement-in-agriculture-data-reveal-the-biggest-violators-and-raise-new-questions-about-how-to-improve-and-target-efforts-to-protect-farmworkers/ [hereinafter *Labor Standards Enforcement in Agriculture*].

[9] *See*, *e.g.*, Daniel Costa, *The farmworker wage gap continued in 2020*, Economic Policy Institute (July 20, 2021), https://www.epi.org/blog/the-farmworker-wage-gap-continued-in-2020-farmworkers-and-h-2a-workers-earned-very-low-wages-during-the-pandemic-even-compared-with-other-low-wage-workers/.

[10] *Labor Standards Enforcement in Agriculture* at 5-6.

violations and a corresponding lack of employer compliance with baseline labor standards.[11]

As an example, EPI analyzed data from the U.S. Department of Labor (DOL)'s Wage and Hour Division (WHD), showing that it conducted more than 31,000 investigations of U.S. employers in agriculture between fiscal years 2000 and 2019. The DOL found violations of fair pay and adequate housing law, as well as transportation dangers, lack of employer disclosures to workers, and faulty or non-existent record-keeping of wages and hours required of employers. As a result of these investigations, employers in violation were ordered to pay $76 million in back wages to 154,000 farmworkers and to pay $63 million in civil money penalties to the WHD.[12] This same dataset showed that in 2019, average back wages owed per worker were $572 for violations of the Migrant and Seasonal Agricultural Worker Protection Act, $485 for violations of the H-2A visa program, and $813 for violations of the Fair Labor Standards Act.[13]

These numbers only amount to a small percentage of actual violations in a high-violation industry, because they represent only those claims that were investigated by the DOL when workers came forward.[14] The EPI report finds that

---

[11] *Id.* at 2, 4.

[12] *Id.* at 5.

[13] *Id*.

[14] *Id.* at 1.

"the vast majority of investigations of farm employers detect violations, a sign that these employers are not complying with federal wage and hour laws. Some 70% of investigations conducted by WHD in agriculture detected violations, including 40% that detected one to four violations and 30% that detected five or more violations."[15]

The workers in H-2A-approved construction jobs include the very workers most in need of protection under the FLSA: lower-paid, immigrant workers fearing retaliation if they speak up about working conditions. Analyzing employer disclosures submitted as part of the H-2A certification required by companies seeking approval of the seasonal visas, the National Employment Law Project (NELP) found that employers seeking approval for H-2A "Construction Laborers" promised to pay an average hourly wage of $14.70, and stated that anticipated hours worked per week was an average of 44.24. The range of anticipated work hours reported in these disclosures is 40-55.[16] While the employer certifications themselves are strong proof of long hours worked by these workers, these employer disclosures do not necessarily reflect actual pay and hours worked, and are most likely under-counting actual hours worked, especially when employers claim overtime exemptions and have little incentive to curtail excessive hours.

---

[15] *Id*.

[16] NELP analysis of U.S. DOL H-2A data, *supra* note 5.

**B. Overtime protections are meant to provide economic security and health and safety.**

If Plaintiff and similarly situated construction workers are covered by the FLSA's overtime protections, it would ensure that these workers receive the critical economic, health, safety, and quality-of-life benefits afforded by overtime protections. The availability of overtime pay has a significant impact on workers' annual earnings. For example, EPI in 2017 estimated that a Congressional proposal to expand eligibility for overtime protection would have boosted affected workers' paychecks by $1.2 billion annually.[17]

Further, the FLSA's overtime protections were intended to—and in fact do—improve more than workers' pay. One of Congress's key purposes in enacting the FLSA was to protect workers from difficult working conditions that are "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). The overtime premium pay requirement carries out this objective by disincentivizing employers from requiring workers to labor for more than 40 hours per week, which has two key effects for workers' health and general well-being.

---

[17] Heidi Shierholz, *Federal overtime pay bill would boost paychecks by $1.2 billion annually*, Economic Policy Institute (Dec. 1, 2017), https://www.epi.org/publication/federal-overtime-pay-bill-would-boost-paychecks-by-1-2-billion-dollars-annually/.

First, workers covered by overtime protections gain quality-of-life benefits, including the opportunity to have basic work-life balance, to pursue other activities, and to invest in their children's care and education outside work hours.[18] Second, overtime protections prevent workers from being subjected to unhealthy and unsafe conditions for overly long periods of time. Studies have shown that being required to work overtime hours is associated with significantly higher injury hazard rates.[19]

Construction workers like Plaintiff labor in dangerous conditions, as they regularly "engage in many activities that may expose them to serious hazards, such as falling from rooftops, unguarded machinery, being struck by heavy construction equipment, electrocutions, silica dust, and asbestos."[20] Rates of accidental injury and death have historically run higher in construction than in any other industry, and the industry continues to rank among the most hazardous for workers.[21]

---

[18] *See generally* Shirley Lung, *Overwork and Overtime*, 39 IND. L. REV. 51, 53-59 (2005) (discussing how the movement for an 8-hour day contributed to the FLSA's maximum hours protections).

[19] *See, e.g.*, A.E. Dembe et al., *The impact of overtime and long work hours on occupational injuries and illness: new evidence from the United States*, 62 J. OCCUPATIONAL & ENVIRONMENTAL MEDICINE 588 (2005), https://oem.bmj.com/content/oemed/62/9/588.full.pdf.

[20] Occupational Safety and Health Administration, *Construction Industry*, https://www.osha.gov/construction (last visited Sept. 25, 2021).

[21] *See, e.g.*, Maurizio Guerrero, *The return of the construction industry has brought a surge of immigrant worker deaths,* In These Times (Aug. 13, 2020), https://inthesetimes.com/article/construction-industry-immigrant-worker-deaths-

A recent study revealed that construction workers also are at high risk for developing work-related musculoskeletal disorders due to excessive exposure to vibration, bending, twisting, and adopting awkward body postures.[22] The same study showed that overexertion due to overwork is a major factor that puts construction workers at risk of developing musculoskeletal disorders.[23] Another study of construction workers found that working too many hours "can have negative consequences" including "sleep deprivation, increased levels of fatigue and stress, and . . . increased risk for accidents and injury."[24]

Without overtime coverage for their construction employees, employers like Defendant will continue to require their workers to labor for overly long workdays with low pay, denying them the critical economic, quality-of-life, and health and safety benefits that overtime protections would provide.

_____

fatalities; *Safety training falls short for immigrant workers at small construction companies,* Safety and Health Magazine (May 21, 2018), https://www.safetyandhealthmagazine.com/articles/17022-training-falls-short-for-immigrant-workers-at-small-construction-companies-study.

[22] Shereen Lehman, *Construction workers still at high risk for strains and sprains*, Reuters (Jan. 16, 2017), https://www.reuters.com/article/us-health-ergonomics-construction-worker-idUSKBN150243 (reporting on new study from Journal of Occupational and Environmental Medicine).

[23] *Id.*

[24] Linda M. Goldenhar, et al., *The ''Goldilocks model'' of overtime in construction: not too much, not too little, but just right*, 34 J. SAFETY RESEARCH 215, 222 (2003).

### IV.    Overtime protections spread work, helping to reduce unemployment.

Overtime protections for Mr. Luna Vanegas and similarly situated construction workers would also have important benefits for other workers, insofar as the FLSA helps spread work more broadly among the population, thereby reducing unemployment.

A "central goal" of the FLSA's maximum hours policy was work-spreading, i.e., "diminishing unemployment by spreading the available work among all those customarily employed in a particular field."[25] The overtime premium pay requirement carries out this objective by disincentivizing employers from requiring workers to labor for more than 40 hours per week, and instead incentivizing employers to hire additional workers to work at the regular rate to avoid paying the overtime wage. *See Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 577–78 (1942) ("By this requirement, although overtime was not flatly prohibited, financial pressure was applied to spread employment to avoid the extra wage and workers were assured additional pay to compensate them for the burden of a workweek beyond the hours fixed in the act. In a period of widespread unemployment and small

---

[25] Deborah C. Malamud, *Engineering the Middle Classes: Class Line-Drawing in New Deal Hours Legislation*, 96 U. MICH. L. REV. 2212, 2223 (1998).

profits, the economy inherent in avoiding extra pay was expected to have an appreciable effect in the distribution of available work.")

If contracted construction workers like Mr. Luna Vanegas are not covered by the FLSA's overtime protections, employers like Defendant will be incentivized to maintain smaller workforces and work their employees for longer hours, rather than being encouraged to hire more workers—meaning fewer opportunities for other construction workers to earn a living.

## CONCLUSION

For the foregoing reasons, the Court should overturn the district court's decision and remand to further develop facts and require the Defendant to prove that it can use an exemption intended for use by its agricultural customers.

Dated:  December 7, 2021                          Respectfully submitted,

                                                  /s/ Catherine Ruckelshaus
                                                  Catherine Ruckelshaus
                                                  Brian Chen

                                                  National Employment Law Project
                                                  90 Broad Street, Suite 1100
                                                  New York, NY 10004
                                                  (646) 693-8221
                                                  cruckelshaus@nelp.org
                                                  bchen@nelp.org

                                                  *Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 4,427 words, including footnotes and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure Rule 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared using Microsoft Office Word and is set in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: December 7, 2021                   /s/ Catherine Ruckelshaus
                                          Attorney for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2021, the Brief of Amici Curiae Centro de los Derechos del Migrante, Economic Policy Institute, Shriver Center on Poverty Law, and the National Employment Law Project was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Catherine Ruckelshaus
Attorney for Amici Curiae