**No. 21-2644**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

| | | |
|---|---|---|
| Jose Ageo LUNA VANEGAS, | ) | On Appeal from the United States |
| | ) | District Court for the Western |
| *Plaintiff-Appellant,* | ) | District of Wisconsin |
| | ) | |
| v. | ) | No. 3:21-cv-00054-jdp |
| | ) | |
| SIGNET BUILDERS, INC., | ) | Hon. James D. Peterson, |
| | ) | Chief District Court Judge |
| *Defendant-Appellee.* | ) | |

**BRIEF OF MARY J. WILSON AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFF-APPELLANT AND REVERSAL**

Ross B. Bricker
  *Counsel of Record*
Clifford W. Berlow
Catherine L. Doyle
Jay K. Simmons
Casey L. Jedele
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
(312) 222-9350
rbricker@jenner.com

*Counsel for Amicus Curiae
Mary J. Wilson*

December 7, 2021

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2644

Short Caption:  Jose Ageo Luna Vanegas v. Signet Builders, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **[x]**        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Mary J. Wilson

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP for Amicus Curiae

(3)  If the party or amicus is a corporation:

   i)    Identify all its parent corporations, if any; and

   None

   ii)   List any publicly held company that owns 10% or more of the party's or amicus' stock:

   None

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/Ross B. Bricker                                    Date:  December 7, 2021 (new)

Attorney's Printed Name:        Ross B. Bricker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes X No_

Address: Jenner & Block LLP

          353 N. Clark Street, Chicago, IL 60654-3456

Phone Number: (312) 923-4524                          Fax Number: (312) 527-0484

E-Mail Address:        rbricker@jenner.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2644

Short Caption:  Jose Ageo Luna Vanegas v. Signet Builders, Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[x]**        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Mary J. Wilson

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP for Amicus Curiae

(3)   If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)   List any publicly held company that owns 10% or more of the party's or amicus' stock:

        None

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Clifford W. Berlow        Date:  December 7, 2021 (new)

Attorney's Printed Name:        Clifford W. Berlow

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes _ No X

Address: Jenner & Block LLP

353 N. Clark Street, Chicago, IL 60654-3456

Phone Number: (312) 840-7366        Fax Number: (312) 527-0484

E-Mail Address:        cberlow@jenner.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2644

Short Caption:  Jose Ageo Luna Vanegas v. Signet Builders, Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

       **[x]**       **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Mary J. Wilson

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP for Amicus Curiae

(3)  If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)   List any publicly held company that owns 10% or more of the party's or amicus' stock:

        None

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Catherine L. Doyle      Date: December 7, 2021 (new)

Attorney's Printed Name:       Catherine L. Doyle

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes _ No X

Address: Jenner & Block LLP

       353 N. Clark Street, Chicago, IL 60654-3456

Phone Number: (312) 840-7207         Fax Number: (312) 527-0484

E-Mail Address:       cdoyle@jenner.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>21-2644</u>

Short Caption: <u>Jose Ageo Luna Vanegas v. Signet Builders, Inc.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **[x]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

<u>Mary J. Wilson</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Jenner & Block LLP for Amicus Curiae</u>

(3) If the party or amicus is a corporation:

    i)   Identify all its parent corporations, if any; and

        <u>None</u>

    ii)   List any publicly held company that owns 10% or more of the party's or amicus' stock:

        <u>None</u>

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
<u>N/A</u>

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
<u>N/A</u>

Attorney's Signature: <u>/s/ Jay K. Simmons</u>          Date: <u>December 7, 2021 (new)</u>

Attorney's Printed Name: <u>     Jay K. Simmons</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes _ No <u>X</u>

Address: <u>Jenner & Block LLP</u>

    <u>353 N. Clark Street, Chicago, IL 60654-3456</u>

Phone Number: <u>(312) 840-7428</u>          Fax Number: <u>(312) 527-0484</u>

E-Mail Address: <u>     jsimmons@jenner.com</u>

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2644

Short Caption: Jose Ageo Luna Vanegas v. Signet Builders, Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[x]**        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Mary J. Wilson

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP for Amicus Curiae

(3) If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

        None

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/Casey L. Jedele    Date: December 7, 2021 (new)

Attorney's Printed Name: Casey L. Jedele

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes _ No X

Address: Jenner & Block LLP

    353 N. Clark Street, Chicago, IL 60654-3456

Phone Number: (312) 840-7443    Fax Number: (312) 527-0484

E-Mail Address: cjedele@jenner.com

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENTS ...................................................... i

TABLE OF AUTHORITIES ................................................................... vii

INTEREST OF *AMICUS CURIAE* ........................................................ 1

BACKGROUND ............................................................................ 3

ARGUMENT ................................................................................ 6

I.  Ms. Wilson's Experience Reflects Disturbing Trends In The Domestic
    Construction Industry Affecting Workers And Businesses Alike. ................ 7

    A.  Ms. Wilson And MCCI Built Domestic Infrastructure, Provided
        Good-Paying Jobs For Hundreds Of Hardworking Americans, And
        Meaningfully Invested In On-The-Job Training. ....................... 7

    B.  MCCI's Construction Business Suffered Due To Specialized Farm
        Labor Contractors Undercutting MCCI's Labor Costs With
        Exploitative Labor Practices. .................................... 10

II. Defendant's Exploitative Labor Practices, Including Withholding Overtime
    Owed To Agricultural Guestworkers Engaged In Non-Agricultural Work,
    Harm Competing Construction Contractors. ............................. 15

    A.  Competitive "Job Costing" Plays A Critical Role In The Functioning
        Of A Sound Construction Bidding System. .......................... 15

    B.  Farm Labor Contractors Systematically Violate FLSA In The
        Context Of Agricultural Construction Projects. .................... 16

    C.  Evasion Of Wage And Overtime Protections Economically Harms
        Local Contractors, Construction Workers, And The Domestic
        Construction Industry. .......................................... 21

III. Defendant's Positions Are Contrary To Applicable Law And Perpetuate
     Economic Harms. ................................................... 23

CONCLUSION ........................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bayside Enters., Inc. v. NLRB*,
    429 U.S. 298 (1977) ..................................................................... 17

*Farmers Reservoir & Irrigation Co. v. McComb*,
    337 U.S. 755 (1949) ..................................................................... 17

*NLRB v. Monterey Cnty. Bldg. & Constr. Trades Council*,
    335 F.2d 927 (9th Cir. 1964) ..................................................... 18

**Statutes and Rules**

8 U.S.C. § 1101(a)(15)(H)(ii)(a) ......................................................... 17

8 U.S.C. § 1184.................................................................................... 17

8 U.S.C. § 1188(a)(1)(A) ............................................................... 17, 22

29 U.S.C. § 203(f)............................................................................... 17

29 U.S.C. § 207(a)(1) ......................................................................... 16

29 U.S.C. § 213(b)(12) ................................................................. 16, 17

Fed. R. App. P. 29(a) ........................................................................... 1

**Other Authorities**

56 Ill. Admin. Code 210.110............................................................... 12

*About Us*, Michel Concrete Construction........................................... 4

Jim Baty, *Letter from the President: Greetings from the New Pres!*,
    Concrete Facts Mag. (Sept. 6, 2018)............................................. 5

*CFA Members Elect New Members of the Board*, Concrete Constr.
    (Sept. 30, 2011)............................................................................. 5

*CFA's Most Valuable Person Award,* Concrete Foundations Ass'n..... 5

*Code Requirements for Residential Concrete (ACI 332-20) and
Commentary,* An ACI Standard, Am. Concrete Inst. (Oct. 2020)................... 5

*Concrete Foundations Ass'n Members Elect New Board Members*,
    Constr. Superintendent (Sept. 2011) ............................................. 5

Daniel Costa, *Wages are still too low in H-2B Occupations*, Econ.
    Pol'y Inst.:  Working Econ. Blog (Mar. 18, 2021, 11:40 AM) ...................... 16

Stephen Franklin et al., *The Visa Loophole that Big Ag Construction
    Firms Love to Exploit*, In These Times (Apr. 2018) ...................................... 15

*H-2A Visa Program*, Farmers.gov: U.S. Dep't of Agric. .............................. 11, 17

Gabe House, *Minority businesses want a bigger piece of the pie*,
    Springfield Bus. J. (Feb. 2014) .................................................... 5

*Labor Certification Process for the Temporary Employment of Aliens
    in Agriculture in the United States: 2019 Adverse Effect Wage
    Rates for Non-Range Occupations*, 83 Fed. Reg. 246 (Dec. 26,
    2018) ............................................................................ 16

*Performance Data*, U.S. Dep't of Lab. ............................................ 19

Bruce Rushton, *Farming Out Work*, Ill. Times (July 14, 2016) ................. 15, 23

Skyler Simnitt & Marcelo Castillo, *Use of H-2A Guest Farm Worker
    Program More Than Triples in Past Decade*, Econ. Rsch. Serv.
    U.S. Dep't of Agric. (Sept. 7, 2021) ............................................. 20

*Springfield Area Home Builders Association Holds Their Annual
    Installation Banquet,*  Springfield Area Home Builders Ass'n
    (Dec. 18, 2013) ................................................................... 5

Temporary Lab. Camps, 29 C.F.R. 1910.142 (2005) ............................... 15, 23

Rebecca Wasieleski, *Diversification Is Company's Foundation,*
    FORConstructionPROS.com (June 6, 2011) ...................................... 3, 4, 7

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus* is Mary J. Wilson, in her personal capacity. Ms. Wilson is the owner of Michel Concrete Construction, Inc. ("MCCI"), a family-run concrete construction company that ceased operations in early 2019 in part because MCCI's competitors drastically undercut MCCI's labor costs. This systemic undercutting, well illustrated by the allegations made in this case by Plaintiff-Appellant Jose Ageo Luna Vanegas ("Mr. Luna Vanegas"), exploits construction workers, abuses the Fair Labor Standards Act's ("FLSA") agricultural work exemption, and harms small businesses like MCCI that abide by labor laws and regulations.

As alleged by Mr. Luna Vanegas, Defendant-Appellee Signet Builders, Inc. ("Defendant") had migrant guestworkers perform "exclusively non-agricultural" "construction work"—which was not performed incidentally to or in conjunction with the farming operations of any farmer—for over forty hours per week, but Defendant failed to pay its construction workers' overtime. Dkt. 16, Luna Vanegas Opening Br. at A-16, ¶¶ 19-20 (Complaint). It did so despite the fact that migrant guestworkers like Mr. Luna Vanegas never came into contact with livestock, never performed work in the employment of a farmer, and never

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no counsel for a party authored this brief, "in whole or in part," and no counsel or party made a monetary contribution to fund the preparation or submission of this brief. No person other than the *amici curiae*, its members, and its counsel made any monetary contribution to its preparation and submission. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief *amicus curiae*.

performed work incidentally to or in conjunction with any farming operations of any farmer. *Id.* ¶¶ 21-22.

Both Ms. Wilson and the hard-working Americans she proudly employed have been harmed by this sort of practice routinely undertaken by behemoth contractors like Defendant. MCCI's bids and job costing reflected the proper wages due to its employees, including factoring in overtime for the hours in excess of forty per week that construction workers routinely work. Defendant's practices, as alleged by Mr. Luna Vanegas and as observed by Ms. Wilson across the construction industry, thus result in one set of competitors undercutting the labor costs of another. The widespread practice of mislabeling guestworkers engaged in non-agricultural *construction* labor as agricultural employees presented Ms. Wilson with an untenable choice: join her competitors in applying an incorrect reading of federal labor laws, thereby exposing MCCI to the risk of legal challenges and engaging in a practice Ms. Wilson viewed as repugnant and exploitative, or effectively become priced out of the marketplace and lose the loyalty of MCCI's local, domestic workers eager for working hours.

No company should have to face this choice. Traditional construction subcontractors, like MCCI, should not be forced into a race to the bottom, risking FLSA violations to remain competitive with firms like Defendant, which showed themselves willing to test the bounds of legal compliance and fair competition. This market failure undermined Ms. Wilson's family business, along with the hundreds of workers who relied on MCCI for meaningful, well-paying work.

Ms. Wilson has a keen interest in the outcome of this case involving the unlawful exclusion of Mr. Luna Vanegas' work from FLSA overtime requirements. She urges this Court to reverse the decision of the district court and to remand for further proceedings.

## BACKGROUND

Ms. Wilson's decades of experience in the concrete construction business stems from her early childhood, when her father ran a concrete construction company, Michel Concrete, Inc., out of the family home.[2] As a young girl, she watched her father's business grow. Ms. Wilson later studied accounting and business at the University of Illinois and obtained a teaching certificate for early childhood education. Initially, she worked in the education industry after completing her degree, but by 1994 she returned to the construction industry and her family's involvement in it. From approximately 1995 to 2001, together Ms. Wilson and her husband operated a subcontracting business for her father's company. *Id.* By 2005, Ms. Wilson worked directly for her father's company.

Ms. Wilson's primary task in those early years was to conduct "job costing" for the various types of work—commercial, residential, and agricultural—that her family's business performed. This experience not only applied Ms. Wilson's background in accounting and business, but further taught her the ins and outs of the expenses involved in major construction projects (including numerous

---

[2] Rebecca Wasieleski, *Diversification Is Company's Foundation*, FORConstructionPROS.com (June 6, 2011), https://www.forconstructionpros .com/concrete/equipment-products/forms/article/10279673/concrete-contractor-is-diversified.

agricultural enclosure projects) and how to run the day-to-day financials of a local construction company.

Ms. Wilson's role in the family business increased. *Id.* Her primary responsibilities included internal business communications, preparing bids, and resource allocation and coordination. She became familiar with the components of a comprehensive and competitive bid for a construction job early in her tenure. This work consisted of pinpointing the projected costs, including the costs of union and non-union workers, associated with an array of construction projects running the spectrum from dwellings to office buildings to livestock enclosures.

In 2008, Ms. Wilson's parents sold two-thirds of the assets comprising Michele Concrete, Inc.—the commercial and residential business—to a new company, MCCI, owned by Ms. Wilson and her husband. *Id.* In 2009, MCCI obtained the agricultural construction business from Michel Concrete, Inc., as well. *Id.* Ms. Wilson ultimately became the sole owner of MCCI—including at this point all three divisions of her father's business, commercial, residential, and agricultural—in approximately 2010. *Id.* MCCI was based in Springfield, Illinois, and when the company was operational it performed construction projects across the agricultural, commercial, and residential sectors throughout Central Illinois.[3] In addition to being a Concrete Foundations Association ("CFA")

---

[3] *About Us*, Michel Concrete Construction, https://www.michelconcrete.com/about.html (last visited Dec. 7, 2021).

Certified Contractor, MCCI was designated by the Illinois Department of Central Management Services as a Certified Women's Business Enterprise.[4]

As a small business owner, Ms. Wilson earned personal and business certifications of achievement,[5] served on various local and national committees and boards,[6] received local and national awards,[7] and maintained active memberships in construction and business-related trade organizations.[8] Simply put, Ms. Wilson steadily learned the business from her involvement with her father's successful construction company, carried on the family tradition through her own business, invested in her community by providing meaningful

---

[4] *See* Gabe House, *Minority businesses want a bigger piece of the pie*, Springfield Bus. J. (Feb. 2014), SBJ_Feb2014.pdf (springfieldbusinessjournal.com).

[5] ACI-Flatwork Technician, ACI-Foundation Technician, WBENC-WBE, IDOT-DBE, CMS-DBE, CFA-Certified Foundation Contractor.

[6] ACI 332 Code Committee (secretary); ACI C655 Certification Committee (member); SAHBA (President); CFA Board of Directors (Secretary) & (Treasurer); *see* Jim Baty, *Letter from the President: Greetings from the New Pres!*, Concrete Facts Mag. (Sept. 6, 2018), http://concretefactsmagazine.com/2018/09/06/letter-from-the-president-greetings-from-the-new-pres/; *CFA Members Elect New Members of the Board*, Concrete Constr. (Sept. 30, 2011), https://www.concreteconstruction.net/business/cfa-members-elect-new-members-of-the-board_o; *Concrete Foundations Ass'n Members Elect New Board Members*, Constr. Superintendent (Sept. 2011), https://consupt.com/2011/09/concrete-foundations-association-members-elect-new-board-members/.

[7] CFA (2014 MVP); Springfield Area Home Builders Ass'n (Builder of the Year). *See CFA's Most Valuable Person Award*, Concrete Foundations Ass'n, https://www.cfaconcretepros.org/most-valuable-person (last visited Dec. 7, 2021); *Springfield Area Home Builders Association Holds Their Annual Installation Banquet,* Springfield Area Home Builders Ass'n (Dec. 18, 2013).

[8] Springfield Chamber of Commerce, Concrete Foundations Ass'n, American Society of Concrete Contractors, American Concrete Pumping Ass'n, American Concrete Institute. *See Code Requirements for Residential Concrete (ACI 332-20) and Commentary,* An ACI Standard, Am. Concrete Inst. (Oct. 2020), https://www.concrete.org/Portals/0/Files/PDF/Previews/332-20_preview.pdf.

and competitively-paid jobs to local workers, and contributed to the industry through leadership positions in relevant organizations.

Today, MCCI is no longer operational. MCCI's last payroll was made in the first quarter of 2019, and in March 2019, the company sold all its equipment. Ms. Wilson thus offers her experience to this Court for consideration of the commercial impact of widespread wage and hour exploitation, such as Mr. Luna Vanegas alleges against Defendant, on other small businesses struggling to compete without risking manipulation of the H-2A visa program and misclassification of their workers.

ARGUMENT

Ms. Wilson supports the rights of local and regional construction contractors and construction workers alike to participate in a fair, competitive, and humane agricultural construction industry. She submits this *amicus* brief to highlight her experience as a leading concrete construction contractor in Central Illinois. MCCI followed the rules, paid its employees their due overtime, and lost market share because of it. Meanwhile, its national competitors were more willing to push the envelope and absorb the risk of litigation in exchange for cheap labor and were rewarded for it.

Ms. Wilson's experience underscores the importance of federal wage and overtime protections for construction workers, like Mr. Luna Vanegas, because requiring all employers—not just small businesses who cannot afford lobbyists and lawyers, like MCCI, but *all* employers—to play by the same rules ensures a fair and competitive playing field in the construction industry. Ms. Wilson's

experience demonstrates the expansive scope of economic harms that will perpetuate, impacting both workers and companies, if Mr. Luna Vanegas' suit fails as a matter of law at the motion to dismiss phase.

## I.    Ms. Wilson's Experience Reflects Disturbing Trends In The Domestic Construction Industry Affecting Workers And Businesses Alike.

### A.    Ms. Wilson And MCCI Built Domestic Infrastructure, Provided Good-Paying Jobs For Hundreds Of Hardworking Americans, And Meaningfully Invested In On-The-Job Training.

In 2010, approximately half of MCCI's work came from commercial projects, with the remaining half split almost equally between agricultural and residential projects. MCCI benefitted from "equipment ownership, field crew expertise and relationships with customers in all three markets" which allowed Ms. Wilson to "keep those numbers fluid year to year," and afforded MCCI a "strong business model in any economy." Wasieleski, *supra*, note 2. MCCI geographically centered its business in the Midwest, but its diversification across project categories insulated its overall financial performance against temporary slowdowns in any one sector at a given time.[9]

Prior to 2008, when Ms. Wilson's father still owned all segments of Michel Concrete, Inc., the company performed approximately 10 to 12 agricultural jobs, 60 residential jobs, and 30 to 40 commercial jobs per year. In some years, the firm handled upwards of 200 individual residential projects, though revenue

---

[9] For example, during the economic recession in 2008 and resulting slowdown in agricultural projects, Ms. Wilson leveraged her diverse business model to adapt and transition her workers to other areas, such as commercial and residential projects.

fluctuated significantly year-to-year over the following decade. Whereas in 2010, MCCI performed roughly $8.4 million in jobs, by the time Ms. Wilson contemplated closing down operations, in 2019, MCCI had earned only about $5.9 million in revenue for the year 2018.

MCCI proudly employed domestic union and non-union workers on its commercial, residential, and agricultural crews. MCCI's workforce ranged from new employees who had never previously touched a hammer to full-fledged union journeymen belonging to five different trade unions. All MCCI employees were paid competitive wages and benefits according to their experience level and the type of work being completed.[10] MCCI provided non-union employees modest annual wage raises after employees reached the top of its experienced-based wage scale. In addition, MCCI complied fully with FLSA overtime requirements on its jobs. Although construction work often spanned from sun-up to sundown, any work performed over 40 hours per week was credited as overtime.[11]

MCCI's labor requirements varied between projects and the stage of work on any given project. For example, on days when MCCI poured concrete floors for an agricultural facility, it may have had as many as thirty employees on site at once because the wet concrete work needed to be completed quickly. At its

---

[10] For instance, union workers on commercial jobs received union wages and benefits per agreed rates.

[11] Indeed, in Ms. Wilson's experience, workers on large-scale, industrial agricultural projects often worked in excess of fifty to fifty-five hours per week, meaning this work required MCCI to pay overtime wages under federal law.

peak, MCCI employed approximately 70 workers across its various job sites, cumulatively employing hundreds of workers during its years of operations.

MCCI also performed projects on "remote" sites, which were more than one hour away from its headquarters in Springfield. MCCI provided company vehicles and the employees who drove those company vehicles to and from the remote site were paid $10 per hour for that time, while employees riding, rather than driving, to and from remote jobsites were paid only for one-way travel. If workers required overnight accommodations for remote site projects, MCCI provided double occupancy hotel rooms and paid a $20 per diem to each worker.

In addition to monetary investments in MCCI's workers, Ms. Wilson trained new entrants to the construction industry with transferable skills they could leverage into well-paying, long-term, and fulfilling careers. Ms. Wilson's background in the education industry informed MCCI's employee training and development programs. MCCI's informal apprenticeship program entailed introducing new employees and developing their skills through a foundation of more accessible and routine tasks before moving to more complex and specialized work.

MCCI's agricultural projects, in particular, provided opportunities for new applicants to break into the business. Ms. Wilson discovered that agricultural projects often involved repetitive and beginner-level tasks on the same physical jobsite. This offered the perfect training ground for unskilled domestic construction workers to become familiar with the tools and learn the trade. Rather than going to a new residential or commercial jobsite each day or

performing an array of construction skills unique to different types of properties, agricultural enclosure work provided a way to "onboard" individuals who otherwise may have not broken into the industry.

Starting in 2008 to 2009, larger competitors, like Defendant and another national construction company against whom MCCI competed, Alewelt Construction Inc. ("Alewelt"), shifted their portfolio to focus entirely on industrial-scale agricultural projects. In petitioning for migrant guestworkers, larger firms demanded greater levels of training (one month) and experience executing high threshold tasks (*i.e.*, work requiring sophisticated techniques or non-repetitive processes) in order to qualify workers for their crews, despite workers not actually needing such skills to perform most agricultural construction projects. These purported "requirements" had the effect of disqualifying domestic workers otherwise eager for the work. While companies like Defendant and Alewelt claimed agriculture enclosure projects called for uniquely specialized labor, in Ms. Wilson's experience, the opposite was true. Ms. Wilson found that agricultural enclosures were an ideal starting point for even entry-level American workers if the company was willing to staff strategically and invest in those workers.

**B.    MCCI's Construction Business Suffered Due To Specialized Farm Labor Contractors Undercutting MCCI's Labor Costs With Exploitative Labor Practices.**

Following the recession from 2008 to 2009, Ms. Wilson observed that the market for agricultural construction projects did not rebound as expected and prices for most agricultural projects remained below MCCI's costs. It appeared

the market had undergone a structural shift that could not be readily explained based on Ms. Wilson's experience with job costing.

In one instance, MCCI had to reduce its bid on a commercial project for a repeat customer due to a suspiciously low-priced bid from Alewelt. The project involved building a cabinet manufacturing facility on a remote jobsite. MCCI initially submitted a competitive bid incorporating domestic construction labor but nearly lost this business to Alewelt, which incorporated H-2A workers into its job costing. Ms. Wilson was surprised to learn of the incorporation of H-2A workers into Alewelt's bid given that the H-2A visa program was designed for agricultural work such as planting and cultivating, rather than construction work, and as a temporary solution to fill in gaps where domestic workers (such as MCCI's employees) were unavailable. *H-2A Visa Program*, Farmers.gov: U.S. Dep't of Agric. (last visited Dec. 7, 2021), https://www.farmers.gov/working-with-us/h2a-visa-program (promoting the H-2A Visa Program to farmers who need "seasonal or temporary workers for *planting, cultivating, and harvesting crops*") (emphasis added). Although MCCI was ultimately awarded the job, it had to reduce its bid to compete with Alewelt's cheaper H-2A "agricultural" labor, including its lack of overtime pay.

In another instance, Ms. Wilson's father's agricultural construction company, Michel Concrete, Inc., had enjoyed an ongoing business relationship with Longhorn Confinement in Pittsfield, Illinois, spanning numerous projects. After Alewelt shifted its workforce to H-2A workers and undercut MCCI's prices, Longhorn Confinement moved its business to Alewelt despite its successful

history with the Michel family companies. In early 2014, however, Longhorn contacted MCCI to complete two finishing barns, because Alewelt was unable to obtain workers for January to April construction. MCCI, in need of work, agreed to do these projects at the prices Alewelt published on the internet. Even though Alewelt's price was far below what MCCI needed to sustain its business long-term, MCCI hoped that successful completion of the work would reestablish the customer relationship with Longhorn, at a more reasonable price, in the future. Unfortunately, that was not the case, and MCCI continued to be effectively priced out of business by Alewelt. Losing a repeat customer confirmed to Ms. Wilson that she could not effectively compete with Alewelt and other large-scale industrial agricultural construction companies unless she similarly flouted federal labor laws.[12]

In a third instance, Ms. Wilson's reached out to a contact at Carthage Veterinary Clinic, in 2012, to ask if there was any work MCCI could perform for them. That phone call resulted in a job called South Morgan Acres, LLC near LaHarpe, Illinois. MCCI accepted this job at a price lower than what was sustainable for them long term because it badly needed the work and a good faith effort on MCCI's part might lead to more profitable jobs in the future. The contract MCCI signed listed South Morgan Farms, LLC (Illinois) as the owner,

---

[12] Ms. Wilson also adhered to state labor laws. *See* 56 Ill. Admin. Code 210.110 (defining "[a]griculture" to mean "farming in all of its branches"; the phrase "incident to or in conjunction with" does "not include construction by a private contractor of farm buildings on a farm").

MP3 Management, LLC (Indiana) as the construction manager, and Joe Connor as the owner's representative.[13]

Alewelt had petitioned and received certification to bring workers in for this specific job, as well, ETA Case No. C12054-33062. Alewelt's advertised wage for this job was $11.10 per hour, with no overtime wage allowance—$5.64 per hour less than MCCI's average wage cost. Had MCCI employed H-2A workers for the same number of hours and not paid overtime, they would have saved $106,605.87 in wage costs. In addition to saving the cost of wages, MCCI would not have incurred the burden of $50,649.23 for payroll taxes (FICA and MCARE match, FUTA, and SUTA).

Unfortunately, MCCI's investment in performing work at a discount for Longhorn Confinement did not lead to subsequent agricultural jobs, and as MCCI struggled to win bids, it became unable to generate sufficient revenue to support its overhead. With agricultural construction work no longer a viable option, MCCI lost the advantage formerly enjoyed by its business diversity and generated revenue solely through its commercial and residential work. However, pricing in those market sectors was already highly competitive; and since MCCI needed to win a larger portion of the work in order to make up for the agricultural

---

[13] MCCI worked on the project from July 24, 2012 to March 19, 2013. During that time, MCCI's employees worked a total of 18,901.75 hours and paid $316,557.71 in total wages. Nearly 17% of the hours worked, (3,191 hours) were overtime hours, which were properly paid overtime wages. The average regular time wage MCCI paid for this job was $15.62, and the average overtime wage was $22.28. If all hours were equal, (overtime paid at the regular rate) the average wage MCCI incurred, per hour, was $16.74.

shortfall, MCCI was forced to reduce its residential and commercial prices. MCCI's competitors followed suit; pricing in all markets became extremely competitive with prices falling quicker than associated costs as contractors entered increasingly aggressive bids. As a result, MCCI's employees received fewer hours on projects. This reduced wages and drove many workers out of the industry altogether. MCCI struggled to invest in its physical capital, as well, and eventually reached a point where it could no longer compete without significant long-term investments in physical capital, which were not justified by projected revenues.

Faced with suspiciously low bids from "Farm Labor Contractors" ("FLCs"), including Defendant and Alewelt, Ms. Wilson discovered that, by routinely importing H-2A guestworkers for agricultural construction and withholding overtime for workers like Mr. Luna Vanegas, her competitors reduced their labor costs relative to traditional construction contractors like MCCI. They did so by applying a misguided reading of FLSA wage and overtime requirements that ran counter to Ms. Wilson's experience of agricultural enclosure projects as compared to commercial and residential construction work.

Ms. Wilson contacted executive authorities including the U.S. Department of Health & Human Services, Office of Inspector General, the Department of Labor ("DOL"), the Secretary of State, and other lawmakers to bring this exploitative conduct to light. Ms. Wilson also shared information with a journalist who subsequently reported the widespread impact in the construction

industry of abuse of the H-2A visa program and failure to pay overtime to migrant guestworkers performing construction work in excess of forty hours per week.[14]

## II.  Defendant's Exploitative Labor Practices, Including Withholding Overtime Owed To Agricultural Guestworkers Engaged In Non-Agricultural Work, Harm Competing Construction Contractors.

### A.  Competitive "Job Costing" Plays A Critical Role In The Functioning Of A Sound Construction Bidding System.

As described above, Ms. Wilson was fluent in the ins and outs of "job costing" —the process of accurately projecting the cost of a project—dating back to her earliest work at her father's construction business. Job costing for an accurate and competitive construction services quote requires accounting for certain fixed costs and estimated variable costs. Labor is one of the "big ticket items" within a particular project quote, as labor constitutes a significant estimated variable cost in construction bids. The cost difference between paying overtime for work performed in excess of 40 hours per week and not paying overtime wages can result in significant discrepancies in projected job costs, especially when multiplied across many workers and many hours during the life of a project.

The introduction into the market of migrant guestworkers by certain competitors significantly reduces labor costs as compared to companies, like

---

[14] Stephen Franklin et al., *The Visa Loophole that Big Ag Construction Firms Love to Exploit*, In These Times (Apr. 2018), https://inthesetimes.com/features/farm_industry_migrant_workers_h2a_visa_exploitation.html; Bruce Rushton, *Farming Out Work*, Ill. Times (July 14, 2016), https://www.illinoistimes.com/springfield/farming-out-work/Content?oid=11445326. *See generally* Temporary Lab. Camps, 29 C.F.R. 1910.142 (2005).

MCCI, relying upon the domestic workforce. For example, in 2019, the minimum wage rate for H-2A workers in Illinois was $13.26, and the H-2B average hourly wage for construction laborers in 2019 was $16.10—almost *$3.00 more per hour*. *See Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: 2019 Adverse Effect Wage Rates for Non-Range Occupations*, 83 Fed. Reg. 246 (Dec. 26, 2018); Daniel Costa, *Wages are still too low in H-2B Occupations*, Econ. Pol'y Inst.:  Working Econ. Blog (Mar. 18, 2021, 11:40 AM), https://www.epi.org/blog/wages-are-still-too-low-in-h-2b-occupations-updated-wage-rules-could-ensure-labor-standards-are-protected-and-migrants-are-paid-fairly/ (analyzing data from the Office of Foreign Labor Certification's Performance Data). The average hourly wage for all construction laborers in 2019, including domestic construction workers, was $20.31, *over fifty percent higher* than the H-2A wages of $13.26. *Id.* Thus, a bid for a major construction project using "agricultural" H-2A labor will estimate labor costs at a significantly lower value, undercutting businesses like MCCI that pay wages for construction, and not agricultural, workers. Construction contractors willing to flout H-2A classifications are thus highly incentivized to misclassify work as "agricultural" in order to unlock associated cost savings.

### B.    Farm Labor Contractors Systematically Violate FLSA In The Context Of Agricultural Construction Projects.

FLSA requires employers to provide workers federal employment benefits and overtime pay when employees work more than 40 hours in a week, *see* 29 U.S.C. § 207(a)(1), and exempts "agricultural workers" from this overtime requirement, *see* 29 U.S.C. § 213(b)(12). Simultaneously, the H-2A visa program

allows contractors to import migrant workers for agricultural jobs only if U.S. workers are unavailable to perform the work and the wages and working conditions of the guestworkers will not adversely affect the wages and working conditions of similarly employed U.S. workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1184, 1188(a)(1)(A); *see also, e.g., H-2A Visa Program*, Farmers.gov: US. Dep't of Agric. (last visited Dec. 7, 2021), https://www.farmers.gov/working-with-us/h2a-visa-program (promoting the H-2A Visa Program to farmers when "domestic workers are in short supply"). Construction firms across the country employ migrant workers on a variety of projects under the H-2A agricultural worker and H-2B non-agricultural worker visa programs.

The FLSA only authorizes specific exemptions from its general overtime mandate, including, under 29 U.S.C. § 213(b)(12), an exemption for workers employed in agriculture. The definition of "agriculture" under FLSA consists of two categories: primary agriculture and secondary agriculture. Primary agriculture refers to activities such as tilling the soil, cultivating commodities, or raising livestock. Secondary agriculture refers to "practices . . . performed . . . on a farm as an incident to or in conjunction with such farming operations." 29 U.S.C. § 203(f); *see also Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 762-63 (1949); *Bayside Enters., Inc. v. NLRB*, 429 U.S. 298, 300 n.7 (1977). Constructing animal enclosures is clearly outside the category of primary agriculture. Thus, such work must fall under secondary agriculture for the FLSA exemption to apply.

The only appellate court to consider whether construction of animal enclosures on a farm by an independent construction company falls within the category of secondary agriculture determined that such work is *not* excluded agricultural work. *See NLRB v. Monterey Cnty. Bldg. & Constr. Trades Council*, 335 F.2d 927 (9th Cir. 1964). This authority distinguished industrial activities that are organized separately from farming operations with those activities dependent on the farming operation itself. *Id.* at 931.

As articulated by the Ninth Circuit, building livestock enclosures is "separately organized as an independent productive activity" outside the category of secondary agriculture. *Id.* When contractors like Defendant file labor certification applications to employ H-2A workers, they provide descriptions of the jobs that workers will perform. These descriptions typically indicate that workers will be "on farms" but do not indicate any contact with livestock or other farming operations. *See* A-16, ¶ 19 (noting that Mr. Luna Vanegas "never had any contact with the livestock being raised on the various farms where [his] construction work was performed."). In the context of this case, Defendant's applications included the following duties in petitions to the DOL: "[U]nload materials, lay out lumber, tin sheets, trusses, and other components for building livestock confinement structures. Lift tin sheets to roof and sheet walls, install doors, and caulk structure. Clean up job sites.  Occasional use of forklift upon employer provided certification." Luna Vanegas Opening Br. at 2. All of these tasks precede any agricultural use of the buildings and are separately organized from farming operations. As such, workers engaged in construction of livestock

18

enclosures, like Mr. Luna Vanegas and other migrant guestworkers employed by Defendant, are not agricultural workers. Therefore, their work does not, and should not, fall under the FLSA agricultural exemption.

The current widespread practice of FLCs lowering their project labor costs by importing H-2A migrant guestworkers stems back to a 2008 agreement between the DOL and a single contractor: Alewelt. The DOL stipulated that Alewelt was engaged in "agricultural employment" and thus "subject to the requirement for certification as a farm labor contractor." Order of Dismissal, *In Matter of Alewelt, Inc.*, ALJ No. 2008-TLC-00013 (Feb. 26, 2008). Although Alewelt operates in construction—not agriculture—and was a direct competitor of Ms. Wilson's general construction company, this agreement permitted Alewelt to register as a FLC and subsequently petition to employ H-2A migratory farm laborers at lower wages than the traditional construction workers employed by Alewelt's competitors.

Since then, the construction industry has witnessed an explosion of contractors that perform agricultural work.[15] In 2008, four companies registered as FLCs. By 2015, that number increased by more than 420% to fourteen registered FLCs.[16] By employing H-2A workers in construction work and unlawfully withholding their earned overtime due under FLSA, companies like

---

[15] Public data from the DOL suggests 2008 was the first year companies petitioned to utilize H-2A workers as FLCs on agricultural construction projects. *See Performance Data*, U.S. Dep't of Lab., https://www.dol.gov/agencies/eta/ foreign-labor/performance (last visited Dec. 7, 2021).

[16] *See id.*

Alewelt and Defendant secure lower labor costs and exact a competitive advantage over non-FLC contractors, like MCCI. Alewelt's self-reported payroll information lays this bare.[17] In 2008, the first year Alewelt utilized H-2A workers, the company enjoyed an hourly cost for migrant *agricultural* workers that was 35% lower than the 2007 hourly cost for migrant *construction* workers. Alewelt's 2008 migrant agricultural worker costs, in turn, were *38 to 59% lower than the worker costs of its 2006 domestic workforce*. Similarly, payroll information derived from Alewelt's public H-2A applications from 2015 reflect migrant agricultural wages 20 to 55% lower than the wages Alewelt paid its domestic employees in 2006, nearly a decade ago. At the same time, Alewelt has experienced tremendous growth. Based on applications filed with the DOL, in June 2015, the firm concurrently employed 534 migrant agricultural workers in eight states. This is consistent with the boom of migrant guestworkers that has fundamentally changed the construction industry and put insurmountable competitive pressure on small businesses like Ms. Wilson's.[18] Thus, as discussed further below, the exploitation of migrant agricultural guestworkers like Mr. Luna Vanegas has eroded smaller contractors' revenues and associated wages and benefits for all construction workers.

---

[17] This information was compiled using data received from FOIA request number F2016-810533, a request for copies of all documents related to the Order of Dismissal, *In Matter of Alewelt, Inc.*, 2008-TLC-00013.

[18] Skyler Simnitt & Marcelo Castillo, *Use of H-2A Guest Farm Worker Program More Than Triples in Past Decade*, Econ. Rsch. Serv. U.S. Dep't of Agric. (Sept. 7, 2021), https://www.ers.usda.gov/amber-waves/2021/september/use-of-h-2a-guest-farm-worker-program-more-than-triples-in-past-decade/.

### C.  Evasion Of Wage And Overtime Protections Economically Harms Local Contractors, Construction Workers, And The Domestic Construction Industry.

The misclassification of workers employed in agricultural enclosure construction as H-2A agricultural workers results in a cost advantage for contractors who employ such workers, because H-2A rates are lower than both H-2B rates and domestic worker rates and because H-2A employers are not obligated to pay payroll taxes or unemployment taxes on H-2A wages. In addition, as Mr. Luna Vanegas has alleged in his complaint, contractors, like Defendant, who engage in this exploitative practice attempt to shoehorn the construction work performed by H-2A guestworkers into the FLSA definition of "agricultural" work, in an effort to evade DOL wage and hour regulations. Construction companies that rely on domestic construction workers, like MCCI, however, must, of course, pay time and a half wages for all hours in excess of 40 hours per week under federal law.

Ms. Wilson was forced to choose between competing fairly in compliance with federal law and keeping her company viable. It is hardly surprising MCCI is no longer operational considering this market failure. As discussed above, the pricing pressure imposed by competitors abusing federal labor laws resulted in a considerable decline in MCCI's annual revenues. Ms. Wilson observed pricing for construction services decline precipitously from 2009 to 2019 as MCCI lost bids to lower-priced subcontractors integrating H-2A labor into their quotes.

The unlawful withholding of FLSA overtime in agricultural construction imposes a hardship on local and regional contractors in the first instance; but

that harm is passed on to construction workers. The conduct alleged by Mr. Luna Vanegas has the real and material consequence of lower wages for domestic construction workers, properly classified H-2B workers, and H-2A workers alike, who all receive reduced wages benefits than would otherwise be the case if all employees, migrant or domestic, were paid equitably based on the work actually performed.

MCCI's domestic construction employees historically received modest raises. However, due to pricing pressure from competing contractors abusing the H-2A program, MCCI's revenues declined considerably, and its workforce made less, annually. Fewer jobs equated to fewer compensable hours, effectively reducing workers' salaries. Additionally, contrary to the statutory requirements, *see* 8 U.S.C. § 1188(a)(1)(A), these practices result in fewer job opportunities for U.S. workers, forcing both experienced tradesmen and new workers out of the construction industry altogether. In that vein, contractors engaged in these questionable practices generally require domestic workers to have one month of specific construction-related experience and will not hire U.S. workers interested in a construction career without this experience. Experienced workers who do meet these requirements face lower wages and no overtime during their employ.

H-2A and H-2B workers are similarly harmed by this conduct. H-2B non-agricultural workers face fewer job opportunities because FLCs prefer to employ misclassified H-2A workers at comparatively lower rates, typically without overtime pay. Meanwhile, misclassified H-2A "agricultural" workers like Mr. Luna Vanegas, who engage in *construction* work and not agricultural work, enjoy

22

fewer protections and benefits than would be the case were they properly classified under the visa program. One aspect of the reduced benefits H-2A workers receive as compared to H-2B and domestic workers often includes unlawfully withheld overtime due under FLSA, as alleged by Mr. Luna Vanegas in his complaint. In addition, such workers face housing accommodations on remote sites far below standards for U.S. workers.[19]

In sum, the status quo institutionalizes mistreatment of migrant workers in the construction industry through lower wages, reduced benefits, and poor housing—establishing a caste system on jobsites and reducing the public perception of construction work in the public at large.

### III. Defendant's Positions Are Contrary To Applicable Law And Perpetuate Economic Harms.

As stated in Mr. Luna Vanegas' Opening Brief, the district court misapplied the law when it decided that the facts alleged in his complaint were insufficient, as a matter of law, to survive a motion to dismiss under Rule 12(b)(6). The district court erred by ruling, at the pleadings stage, that Defendant's affirmative defense that Mr. Luna Vanegas' claim was barred by the agricultural exclusion from overtime, despite the fact that the application of that affirmative defense requires evaluation of all facts and circumstances surrounding Mr. Luna Vanegas' work, none of which Mr. Luna Vanegas was obligated to plead in his complaint.

---

[19] *See* Rushton, *supra*, note 14. *See generally* 29 C.F.R. 1910.142, *supra*, note 14.

Ms. Wilson watched the abusive labor practices complained about by Mr. Luna Vanegas from another vantage point—as a small business owner competing directly with larger contractors, including Defendant, but who remained committed to complying with the law and providing overtime wages due to her construction employees for any work performed in excess of 40 hours per week. MCCI and other similarly situated construction companies should not be required to withhold overtime wages due to their employees as a necessary practice to profitably engage in construction work. Moreover, the cost of competitive viability for a company should not be the systematic exploitation of vulnerable workers.

It is imperative that this Court allow Mr. Luna Vanegas' claim to proceed beyond the pleadings stage, to provide an avenue for redress of the harms Defendant's practices caused and continue to cause construction firms and workers alike. Ms. Wilson's experience, along with the experiences of many other traditional construction contractors that refuse to go along with Defendant's exploitative conduct, reinforces Mr. Luna Vanegas' claims. Affirming summary dismissal sanctions the same conduct that undermined Ms. Wilson's business and reduced the available hours, projects, wages, and benefits that would have otherwise been given to some of the hardest-working employees in the United States.

The H-2A visa program authorizes the importation of certain foreign workers to assist businesses on a temporary basis only under very limited circumstances. It does not and should not provide a resource for construction

companies to escape wage and hour requirements and to tap into an unlimited bounty of unprotected foreign workers when there are qualified domestic workers employed by construction companies like MCCI available to perform the same work for fair wages. Moreover, FLSA requirements operate coextensively with the program. FLSA requires payment of overtime due for non-agricultural construction work of the precise variety Defendant assigned Mr. Luna Vanegas. Failure to acknowledge Defendant's obligation to compensate Mr. Luna Vanegas for construction labor performed in excess of 40 hours per week would perpetuate the harms felt across the country by regional construction subcontractors, like MCCI, who abide by the overtime mandate, expanding Defendant's labor-cost advantage over law-abiding contractors.

## CONCLUSION

For the reasons stated, *amicus curiae* Mary J. Wilson respectfully urges this Court to reverse the district court's order granting Defendant's motion to dismiss.

December 7, 2021                    Respectfully submitted,

By: */s/ Ross B. Bricker*
     Ross B. Bricker
     *Counsel of Record*
    Clifford W. Berlow
    Catherine L. Doyle
    Jay K. Simmons
    Casey L. Jedele
    JENNER & BLOCK LLP
    353 N. Clark Street
    Chicago, IL 60654-3456
    (312) 222-9350
    rbricker@jenner.com
    cberlow@jenner.com
    cdoyle@jenner.com

jsimmons@jenner.com
cjedele@jenner.com

*Counsel for Amicus Curiae*
*Mary J. Wilson*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Cir. R. 29 because this brief contains 6,085 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 12 point Bookman Old Style font for the main text and footnotes.

Dated:  December 7, 2021

 

 

                                    /s/ *Ross B. Bricker*
                                    Ross B. Bricker

**CERTIFICATE OF SERVICE**

I, Ross B. Bricker, an attorney, hereby certify that on December 7, 2021, I caused the foregoing **Brief of Mary J. Wilson as *Amicus Curiae* in Support of Plaintiff-Appellant and Reversal** to be electronically filed with the Clerk of the Court for the United States Court Of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to ECF procedure (h)(2) and circuit rule 31(b), and upon notice of this court's acceptance of the electronic brief for filing, I certify that I will cause fifteen copies of the **Brief of Mary J. Wilson as *Amicus Curiae* in Support of Plaintiff-Appellant and Reversal** to be transmitted to the court via UPS overnight delivery, delivery fee prepaid within five days of that date.

/s/ *Ross B. Bricker*
Ross B. Bricker