No. 21-2644

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

Jose Ageo LUNA VANEGAS,

Plaintiff-Appellant,

v.

SIGNET BUILDERS, INC.,

Defendant-Appellee

---

**Appeal from the United States District Court
for the Western District of Wisconsin**
No. 21-CV-54 – The Honorable James D. Peterson, United States District
Judge.

---

**BRIEF OF AMICUS CURIAE WISCONSIN BUILDING TRADES COUNCIL
IN FAVOR OF PLAINTIFF-APPELLANTS**

---

Sara J. Geenen
State Bar No. 1052748
THE PREVIANT LAW FIRM, S.C.
310 W Wisconsin Ave, Suite 100MW
Milwaukee, WI 53203
414-223-0402 (direct)
414-271-6308 (fax)
sjg@previant.com

*Counsel for Amicus Curiae Wisconsin
Building Trades Council*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

CORPORATE DISCLOSURE STATEMENT.................................................... iv

IDENTITY AND INTEREST OF *AMICUS CURIAE*.........................................v

ARGUMENT ..................................................................................1

    I.     SUMMARY OF THE ARGUMENT ..................................................1

    II.    THE FLSA'S AGRICULTURAL EXEMPTION SHOULD NOT EXTEND TO CONSTRUCTION WORK.........................................4

          A.    CONSTRUCTION WORK IS NOT INCIDENTAL TO A FARMER'S AGRICULTURAL PURPOSE...........................6

          B.    APPLYING THE AGRICULTURAL EXEMPTION TO REMOVE CONSTRUCTION WORKERS FROM COVERAGE OF THE FLSA WHEN THEY WORK ON FARMS UNDERMINES NATIONAL LABOR POLICY WITH RESPECT TO THE CONSTRUCTION INDUSTRY. .............................................................9

    III.   EXTENDING THE FLSA'S AGRICULTURAL EXEMPTION TO CONSTRUCTION THAT OCCURS ON FARMS RISKS NEGATIVE ECONOMIC CONSEQUENCES FOR MILLIONS OF WORKERS ........................................................... 14

CONCLUSION.................................................................... 17

CERTIFICATE OF RULE 32 COMPLIANCE ................................. 18

CERTIFICATE OF SERVICE.................................................... 19

# TABLE OF AUTHORITIES

**Cases:**

*Adkins v. Mid-Am. Growers, Inc.,* 167 F.3d 355 (7th Cir. 1999) .......................4

*Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 80 S. Ct. 453, 4 L. Ed. 2d
  393 (1960) .................................................................................................4

*Bayside Enterprises, Inc. v. N.L.R.B.,* 429 U.S. 298, 301, 97 S. Ct. 576
  50 L. Ed. 2d 494 (1977)..............................................................................7

*Bowie v. Gonzalez*, 117 F.2d 11 (1st Cir. 1941) ................................... 11

*Encino Motor Cars, LLC v. Navarro,* 138 S.Ct. 1134, 200 L.Ed.2d
  433 (2018) .................................................................................................. 10

*Farmers Res. & Irrig. Co. v. McComb*, 337 U.S. 755, 69 S.Ct. 1274,
  93 L.Ed. 1672 (1949)................................................................................ 5, 7

*Maneja v. Waialua Agricultural Co.,* 349 U.S. 254, 75 S. Ct. 719,
  99 L. Ed. 1040 (1955)................................................................................4

*Holly Farms Corp. v. NLRB,* 517 U.S. 392 (1996) ...........................................4

*Marshall v. Gulf & Western Industries, Inc.,* 552 F.2d 124, (5th Cir 1977),
  *reh'g denied* 555 F.2d 1391 (1977) ...................................................................5

*Universities Research Ass'n, Inc. v. Coutu,* 450 U.S. 754, 101 S. Ct. 1451
  67 L. Ed. 2d 662 (1981)............................................................................. 12

**Statutes:**

29 U.S.C. *§ 151, et seq.*.................................................................................. 11

29 U.S.C. § 152(3) ......................................................................................... 13

29 U.S.C. § 203(f) ..........................................................................................2

29 U.S.C. § 213(b)(12) ................................................................................... 11

## Regulations

20 C.F.R. § 655.0 ................................................................ 13

20 C.F.R. § 655.120 ............................................................ 14

29 C.F.R. § 503.16 ............................................................. 12

29 C.F.R. § 780.104 .............................................................9

29 C.F.R. § 780.144 .............................................................5

# RULE 26.1 DISCLOSURE

Pursuant to Fed. R. App. P. 29.4(A) and Fed. R. App. P. 26.1, the undersigned counsel provides the following information:

1. The full name of the Amicus that the attorney represents in the case:

   a. Wisconsin Building Trades Council

2. The names of all law firms whose partners or associates have appeared for the Amicus in the case or expected to appear for Amicus Curiae in this Court:

   a. The Previant Law Firm, S.C.

3. If an amicus is a corporation, (i) identify all its parent corporations, if any; and (ii) list any publicly held company that owns 10% or more of the amicus' stock.

   a. WTBC is a federally chartered non-profit corporation. It has no parent corporations, and no publicly held company owns 10% or more of WTBC's stock.

## STATEMENT OF AMICUS CURIAE'S INTEREST
## AND AUTHORITY TO FILE

Wisconsin Building Trades Council (WBTC), by its counsel The Previant Law Firm, S.C., by Sara J. Geenen, pursuant to Rule 29(a)(2), Federal Rules Appellate Procedure, and Circuit Rule 29.1, submits its Amicus Curiae brief after having obtained the consent of all parties.

Amicus Curiae WBTC is an organization composed of by representatives of various building trade unions and advocates on matters crucial to the economic security and wellbeing of the nearly 40,000 members of construction labor unions and all working people in the state of Wisconsin. The WBTC's interest is ensuring that the Fair Labor Standards Act and other labor protections are interpreted and enforced consistent with their purpose, in a manner that promotes economic growth, and reflects the careful balance legislators struck when enacting the agricultural worker exemption upon which Defendant-Appellee Signet Builders, Inc.'s Motion to Dismiss was granted. Application of the exemption in this circumstance undermines the FLSA and worker safety protections afforded construction workers, and upsets area labor standards meant to provide economic safeguards for workers and their communities

The matters addressed herein aid the disposition of the case because they reflect interests not currently represented by the parties, specifically, by

v

addressing the effect extending the FLSA's agricultural exemption to the construction industry, local prevailing wages, and worker protections.

This brief was authored by WBTC's undersigned counsel. No party nor party's counsel contributed money to fund preparation or submitting the brief. No person other than the amicus curiae contributed money intended to fund preparing or submitting the brief.

## ARGUMENT

### I. SUMMARY OF ARGUMENT

The Wisconsin Building Trades Council advocates on behalf of workers in the unionized building and construction trades and all Wisconsin workers and their families, to protect and improve working conditions. The WBTC believes that it is important that all workers – union and non-union and U.S. citizens and foreign nationals alike – are entitled to a fair day's pay for a fair day's work, and overtime compensation should be a part of that bargain.

Defendant-Appellee Signet Builders, Inc. ("Signet") is a construction business. It describes itself as a "framing and erection company" and its website, www.signet.us, boasts that it has a presence in "multiple construction industries" and engages primarily in "large scale" commercial, industrial, agricultural, and federal housing construction projects.[1]

Signet engaged Plaintiff-Appellant Jose Ageo Luna Vanegas to build livestock confinement structures on farms throughout the midwestern United States, including in Jefferson County, Wisconsin. [A-14, ¶ 15]. In the course of his employment, he hung metal sheets to enclose the structure and performed related construction duties.[2] [A-14-15, ¶ 16]. Luna Vanegas did no agricultural work.

---

[1] https://www.linkedin.com/company/signet-builders-inc (last accessed 12/1/2021).

[2] Luna Vanegas was hired to work on construction sites located on farms, and to "…unload materials, lay out lumber, tin sheets, trusses, and other components for building livestock

1

The FLSA requires that employers in most industries pay their employees overtime – a premium rate equal to 1.5 times an employee's regular hourly rate – for all hours worked in excess of 40 per week. 29 U.S.C. § 207. Luna Vanegas worked as a construction laborer for Signet, working with and alongside other laborers and skilled tradesmen and tradeswomen to construct new, massive, and modern livestock containment structures. Luna Vanegas worked more than forty (40) hours per week on these jobs but was not paid the overtime premium rate for those hours beyond forty.

Signet alleged as its defense in its Motion to Dismiss that Luna Vanegas worked as a construction laborer on a farm to build livestock containment structures, and that these structures were necessary to the farms' largely unspecified agricultural purpose(s). On these facts, it argued that Luna Vanegas's construction work was within the scope of the FLSA's agricultural overtime exemption at 29 U.S.C. § 213(b)(12) as work "performed by a farmer or on a farm incident to or in conjunction with" farming operations. 29 U.S.C. § 203(f), and that this work constitutes secondary agriculture of a type the FLSA intended to exempt

The district court erred when it dismissed Luna Vanegas's complaint and concluded that construction work is agricultural – and FLSA exempt – if it

---

confinement structures. Lift tin sheets to roof and sheet walls, install doors, and caulk structure. Clean up job sites. Occasional use of forklift upon employer provided certification." [A-14-15, ¶ 16]

occurs on a farm. Rather than make a limited, fact specific analysis that ensures the exemption applies only to work clearly contemplated by the exemption, the court painted its opinion in broad strokes: a construction employer whose employees are constructing farm buildings on a farm for a farmer by the employees of a non-farmer construction company can claim the FLSA's secondary agricultural exemption. It did not limit application of the agricultural exemption to certain farm-related structures or farmers engaged in certain agricultural enterprises.  It did not limit the application of the objection to any category of construction work or worker. While Luna Vanegas's overtime is at issue in this case, he works alongside skilled tradespeople who frame the structure, level ground, set concrete forms, use cranes to help place prefabricated parts or materials, and install plumbing, HVAC, and/or electrical systems - also on farms. This too-broad decision risks upending stability in the entire construction industry, a major economic sector.

The decision is not supported by facts, is short-sighted, and misconstrues the scope and intent of the FLSA and its secondary agricultural exemption. The FLSA's legislative history is clear: the Act and its exemptions are to be construed so some employers do not unfairly gain unfair competitive advantage against other employers bidding for similar work, to maximize employment, and prevent a race to the bottom in wages as a means to create labor peace and strengthen the economy. The FLSA with other labor laws and

worker protections, against the backdrop of the construction industry's high union density and widespread use of collectively bargained area agreements, create a well-worn framework that support these goals while placing industry employers on even footing with one another as to labor costs. The district court's interpretation and application of the FLSA's agricultural exemption undermines this rubric. The district court's opinion should be reversed.

## II.    THE FLSA'S AGRICULTURAL EXEMPTION SHOULD NOT EXTEND TO CONSTRUCTION WORK.

The application of the FLSA's exemptions is "limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960). While "[the agricultural] exemption was meant to embrace the whole field of agriculture," it "was meant to apply *only* to agriculture;" otherwise agricultural enterprises that engage in non-agricultural work would enjoy "an artificial competitive advantage over enterprises that do not enjoy an exemption from the Fair Labor Standards Act." *Maneja v. Waialua Agricultural Co.,* 349 U.S. 254, 267, 75 S. Ct. 719, 727, 99 L. Ed. 1040 (1955); *Adkins v. Mid-Am. Growers, Inc.,* 167 F.3d 355, 359 (7th Cir. 1999))(emphasis added).

"The line between practices that are, and those that are not, performed 'as an incident to or in conjunction with' such farming operations is not

susceptible to precise definition.'" *Holly Farms Corp. v. NLRB,* 517 U.S. 392, 408 (1996) (quoting 29 C.F.R. § 780.144). Identifying that line, however, is critical to ensuring that the requirements of the FLSA are extended as broadly as intended and that the exemptions are confined to clearly exempt conduct.

The district court's decision removes the line altogether. Where does the exemption end? If the work that Luna Vanegas did is "agricultural" because it occurred on a farm for eventual use in the farmer's unspecified agricultural operations, the exemption would apply to nearly any kind of work a farmer contracts a non-farmer third party business to perform on its farm if that third party's product or service is somehow related to or used over the life of its agricultural operations or farming.

That a practice is necessary to agricultural production does not mean the practice is agricultural. *Farmers Res. & Irrig. Co. v. McComb*, 337 U.S. 755, 759, 69 S.Ct. 1274, 1278, 93 L.Ed. 1672 (1949). Work is "incidental" to or "in conjunction with" agriculture if its entire purpose is in support of the farmer's active agricultural function, but not if it is a separately organized productive activity. *Marshall v. Gulf & Western Industries, Inc.,* 552 F.2d 124, 126 (5th Cir 1977), *reh'g denied* 555 F.2d 1391 (citing *Farmers*, 337 U.S. at 761)). Additionally, the practice must be an established part of agriculture and subordinate to the farming operations involved. 29 C.F.R. § 780.144.

A.    CONSTRUCTION WORK IS NOT INCIDENTAL TO A
FARMER'S AGRICULTURAL PURPOSE.

Signet is a construction company, not a farmer. Construction is not a primary agricultural activity. It is non-exempt work under the FLSA unless it is fits within the FLSA's "secondary" agricultural exemption. It does not. Whether construction of a structure or structures "is incidental to" or "in conjunction with" agriculture is considered in the context of the farmer's agricultural purpose, not agriculture generally.

A modern livestock structure is not comparable to a silo or granary, the types of construction enumerated among examples of exempt, non-agricultural tasks incidental to crop production agriculture when the FLSA was introduced in the late 1930s. Notably, in the 1930s, fewer than 10% of U.S. farms had access to electricity.[3]

Signet constructs modern livestock containment structures for concentrated agricultural feeding operations (CAFOs). CAFO projects are significant and generate a significant amount of construction work. Modern agricultural structures run on electricity and are temperature controlled, well ventilated, contain automated components to water or feed livestock, and likely use computer systems to track and schedule livestock feeding or output or

---

[3] Harold D. Wallace Jr., *Power from the people, Rural Electrification Brought More Than Lights.* National Museum of American History, (Feb. 12, 2016) https://americanhistory.si.edu/blog/rural-electrification (last accessed 12/7/2021).

other functions. They are not ordinarily built by farmers nor are they part of the farmer's agricultural operations even though they will be used and are necessary for planned operations.

Recent CAFO construction projects on which Signet may have employed construction laborers included multiple barns as well as feed mills, an office building and manufacturing, poultry processing and fertilizer production facilities. [4,5] The lack of evidence on the nature and purpose of the structures built, the scope of the construction projects, and the farm's specific agricultural purpose, precludes Signet from establishing its laborers' work was "incidental to" or in conjunction with the farm's agricultural purpose. This is particularly the case where some types of buildings related to agricultural activity are not entitled to an exemption. See, e.g. *Bayside Enterprises, Inc. v. N.L.R.B.,* 429 U.S. 298, 301, 97 S. Ct. 576, 579, 50 L. Ed. 2d 494 (1977) (poultry feed mill and processing plant are not agricultural operations" under the FLSA).

---

[4]Signet employed H-2A as "farm laborers" at Cold Spring Egg Farm, in Palmyra, Wisc. in a project that included the construction of 6 new barns and an expansion of pelleting operations, a processing plant, and storage facilities. Job Order, ETA Case H-300-21245-562896, https://seasonaljobs.dol.gov/jobs/H-300-21245-562896 (last accessed 12/6/2021)) Alex Zoellner, "Input heard on egg farm expansion," Daily Jefferson County Union, (20-Feb 17). https://www.dailyunion.com/news/input-heard-on-egg-farm-expansion/article_34eb0a64-f782-11e6-8c33-13367264b2de.html (last accessed 12/7/21).

[5] A similar project in Lake Mills, Wisconsin, involving another poultry operator, involved building new, modern barns in addition to the construction of new offices and biosecurity buildings and a poultry processing plant and a feed mill among other structures, in mid-2019, which is the same period of time Luna Vanegas was employed in Lake Mills by Signet. See,

Department of Labor regulations introduced in 1970s acknowledge that, as the result of industry modernization and specialization, certain activities formerly exempt when performed by a farmhand, no longer fall within the scope of the agricultural exemption even if it is "necessary" for a farmer's end agricultural purpose. "The farmhand who cares for the farmer's mules or prepares his fertilizer is engaged in agriculture" but the maintenance mechanic in a powerplant and the packer in a fertilizer factory are not employed in agriculture, "even if their activity is necessary to farmers and replaces work previously done by farmers. The production of power and the manufacture of fertilizer are independent productive functions, not agriculture." 29 C.F.R. § 780.104.

"Incidental" therefore cannot include anything that happens in aid of or is necessary to the initiation of the agricultural process, simply because it is on a farm and relates to agriculture. The practice must be an established part of agriculture and subordinate to the farming operations involved to be agricultural, 29 C.F.R. § 780.144. Highly specialized construction work is not "incidental," it is independent construction activity, not an agricultural function. *Farmers Reservoir*, 337 U.S. at 759-760. The construction of millions

A-14, 15; see also Sarah Weihert, *Construction on schedule for Daybreak Foods Creekwood Farms*, Lake Mills Leader, 22 Apr. 2019, https://www.hngnews.com/lake_mills_leader/article_f5d35172-5765-546a-9437-5ee3aa30b3cf.html (last accessed 12/7/2021)

of dollars of modern, high-tech barns, poultry processing facilities such as those constructed in projects in which Signet is involved is not "incidental" to ongoing operations.

While livestock confinement structures may be as necessary to raising livestock as electricity and feed, it is a precursor to – not a part of – agricultural activity, and it is performed by a separate business entity, not the farmer obtaining the commodity (the feed) or the service (electricity, construction). See, e.g. 29 C.F.R. § 780.104. For the same reason, the construction of the structure, like the manufacturing of feed, is not agricultural.

B. APPLYING THE AGRICULTURAL EXEMPTION TO REMOVE CONSTRUCTION WORKERS FROM COVERAGE OF THE FLSA WHEN THEY WORK ON FARMS UNDERMINES NATIONAL LABOR POLICY WITH RESPECT TO THE CONSTRUCTION INDUSTRY.

Agricultural construction projects require the work of a variety of skilled tradespersons. There is significant work and the work occurs on a farm. Plumbers, electricians, cement masons, and others are engaged in construction on a farm and nothing in the district court's opinion suggests a logical endpoint as to when and what kind of conduct stops being "incidental to" or "in conjunction with" agricultural activity. Installing and wiring the electrical systems is a necessary part of transforming what is otherwise essentially a warehouse into the finished product, as is placing and installing heating, ventilation, refrigeration, and air conditioning equipment. If Luna Vanegas is

9

not entitled to overtime compensation as a construction laborer, can an electrical contractor refuse to pay overtime to an electrician went to perform construction, repair, or maintenance work on farms? Are skilled tradesmen and tradeswomen – hourly employees covered by the FLSA in all other circumstances and at all other construction sites - exempt from the FLSA's overtime requirements when they spend entire weeks working on a farm and their services are necessary to the proper functioning of a livestock confinement structure?

In interpreting the exemption, courts are required to give FLSA exemption a "fair reading" consistent with the purpose of the Act and the exemptions. *Encino Motor Cars, LLC v. Navarro,* 138 S.Ct. 1134, 1142, 200 L.Ed.2d 433 (2018). A fair reading requires that the exemption be interpreted with a mind toward Congress's intent as evidenced by the FLSA and other federal labor protections. An interpretation that extends – with no questions asked – the FLSA's agricultural exemption to construction of buildings with an agricultural purpose is not the result of a "fair reading."

Federal labor and immigration policy, taken as a whole, reflect Congress's to protect construction industry employees' labor standards while ensuring that employers remain on equal footing while competing for work. These same protections were not extended to productive agricultural activity and work intrinsically tied to the agricultural productive process.

The FLSA was enacted:

> to eliminate from industries engaged in commerce or in the production of goods for commerce the existence of labor conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency and general well-being of workers in such industries and production in order to prevent disruption of such commerce" as may be produced by low wages and long hours.

*Bowie v. Gonzalez*, 117 F.2d 11, 16 (1st Cir. 1941). Agricultural work is excluded from these protections. 29 U.S.C. § 213(b)(12). Construction is not.

Construction workers are entitled to labor protections under the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* They have the right to form or join a union and/or engage in concerted activity to improve their working conditions without fear of recourse.

Construction working conditions are also protected by the Davis-Bacon and Related Acts (DBRA), 40 U.S.C. § 276a. The DBRA require that contractors on federal construction contracts or federally assisted federal contracts pay their mechanics and laborers prevailing area wages, often established by collective bargaining agreements between employers and labor organizations and pay overtime at time and one half the employee's regular rate of pay for all hours worked over 40 in a week. DBRA was "'designed to protect local wage standards by preventing contractors from basing their bids on wages lower than those prevailing in the area..." ...and to "combat the

practice of 'certain itinerant, irresponsible contractors, with itinerant, cheap, bootleg labor, [who] have been going around throughout the country 'picking' off a contact here and a contract there.' The purpose of the bill was 'simply to give local labor and the local contractor a fair opportunity to participate in this building program.'" *Universities Research Ass'n, Inc. v. Coutu,* 450 U.S. 754, 773–74, 101 S. Ct. 1451, 1463, 67 L. Ed. 2d 662 (1981) (citing 87th Cong., 2d Sess., 1 (Comm. Print 1962) (Legislative History), 74 Cong.Rec. 6510 (1931)).

Finally, the non-agricultural seasonal foreign worker visa program contains wage standard protections. The H-2B visa, the one for non-agricultural labor, prior to 2008 was the only option for a construction company seeking to bring foreign construction workers into the United States to perform construction work, including some construction work on farms, also contains area wage rate protections. The H-2B visa program requires that employers who seek to bring in migrant employees offer a wage to such employees that equals or exceeds the higher of the area prevailing wage or applicable minimum wage, and requires that employers comply with other labor standards, like overtime compensation. 29 C.F.R. § 503.16(a). The Department of Labor requires that "the employment of the foreign workers must not

adversely affect the wages and working conditions of similarly-employed U.S. workers." *See, e.g.* 20 C.F.R. § 655.0(a).[6]

Agricultural workers do not enjoy similar protections. They are exempt from the FLSA's protections. They are not covered and protected by the NLRA. 29 U.S.C. § 152(3). Because they are not protected by the NLRA, the industry is not heavily unionized and wages are therefore lower.[7] As a result, "prevailing wage" in the agriculture industry is substantially lower than construction wages. And, the H-2A visa program that applies to agricultural employees contains protections that rely on the more limited legal protections afforded to agricultural workers. [8] As a result, the average wages are lower to begin with and employers pay the "Adverse Effect Wage Rates," which is currently over $5.00 per hour less than the national average wage rate for construction

---

[6] U.S. Department of Labor, *Fact Sheet #78A: Corresponding Employment Under the H-2B Program,* https://www.dol.gov/agencies/whd/fact-sheets/78a-h2b-corresponding-employment (last accessed 12/7/2021).

[7] Economic Policy Institute, *Why Unions are Good for Workers- Especially in a Crisis Like Covid-19, h*ttps://www.epi.org/publication/why-unions-are-good-for-workers-especially-in-a-crisis-like-covid-19-12-policies-that-would-boost-worker-rights-safety-and-wages/ (Last Accessed 12/7/2021)

[8] The H-2A program was entirely off-limits to agricultural construction workers for decades through the 1900s and until 2008 when the DOL – for reasons not entirely clear – settled the employer's appeal of its denial of Alewelt's application to bring in foreign construction workers under the H-2A program. By 2015, "[a]round 1600 H-2A workers were involved in the construction of livestock buildings." *What is Agriculture Anyway: A Closer Look H-2A and H-2B Loophole,* 45 J. Crop. L. 557,567, Joseph Martin (Winter 2020).  That number has increased significantly year over year.

laborers. 20 C.F.R. § 655.120.[9] While employees performing non-exempt functions are still entitled to overtime, using the agricultural label to not pay construction workers overtime necessarily decreases the average wages whether under the H-2A or B programs.

The significant disparity in treatment of construction labor and farm work under the law demonstrate that Congress never intended that purely construction work, performed as a separate business by a construction company, to be shoehorned into the agricultural exemption. An extension of the agricultural overtime exemption to purely construction work performed by employees of a construction employer is at odds with the FLSA's purpose and general legislative scheme applicable to construction work.

## III. EXTENDING THE FLSA'S AGRICULTURAL EXEMPTION TO CONSTRUCTION THAT OCCURS ON FARMS RISKS NEGATIVE ECONOMIC CONSEQUENCES FOR MILLIONS OF WORKERS.

The construction industry is a major driver of United States and individual state economies, including Wisconsin, and the major CAFO construction projects are a part of that. According to the Bureau of Labor Statistics, in the United States, over 7.5 million employees work in construction[10] of whom, about 900,000 are employed as construction laborers.

---

[9] The AEWR in Wisconsin is currently $14.72 per hour, and therefore over $5.00 less per hour than the mean wage rate for construction laborers. *Id.* at 563.

[10] U.S. Department of Labor Bureau of Labor Statistics, *Construction: NAICS 23*, https://www.bls.gov/iag/tgs/iag23.htm (last accessed 12/6/2021).

Approximately 125,000 Wisconsinites are employed in the construction industry.[11]

The economic impact of the construction industry on Wisconsin is significant. For every $1 spent directly within the construction industry, there is an overall economic impact of $1.81 Million.[12] Employment within the construction industry and the wages earned by workers as the result of their work in the industry, in turn, support local economies and create and support other jobs within the state. Every $1 million in construction industry spending generates nearly $700,000 in labor income throughout the state, or 12 jobs on average over the year, of these jobs five (5) are outside of construction and the mean construction laborer wage, nationally, is $20.67.[13]

A strength of the construction industry is derived in part from strong wages and is not accidental. Laws like the NLRA, FLSA, the Davis-Bacon and Related Acts, and DOL's visa requirements that rely on minimum area wages are in place to protect employees' working conditions and the prevailing wage rates in areas where work is being performed. The purpose is not only to ensure

---

[11] U.S Bureau of Labor Statistics, *Databases, Tables & Calculators by Subject, State*, https://data.bls.gov/timeseries/SMS55000002000000001?amp%253bdata_tool=XGtable&output_view=data&include_graphs=true (last accessed 12/6/2021).
[12] *Economic Impact of Wisconsin Construction Industry Estimated at $50.3B*, https://www.acppubs.com/articles/economic-impact-of-wisconsin-construction-industry-estimated-at-50-3b (last accessed 12/6/2021).
[13] BLS Midwest Information Office. *Occupational Employment and Wages in Janesville-Beloit – May 2020*, https://www.bls.gov/regions/midwest/news-release/occupationalemploymentandwages_janesville.htm (last accessed 12/6/2021).

15

that employers within the industry compete against each other on equal footing, not at the expense of or by undercutting their employee wages, so that employees are paid fair wages for a fair day's work in one of the most dangerous occupations,[14] but also for the greater economic good. Strong, predictable earnings (which include overtime) from construction work ensure that construction workers can support themselves and their families while supporting other jobs within their communities by purchasing goods, services, and property, and in turn generates payroll, income, and sales tax income for municipal, state, and federal governments, which in turn is used to provide public services and infrastructure repairs and development.

Expanding the reach of the FLSA agricultural exemption to construction on farms undermines wages, thus weakening the economic impact of the work. To the extent the lower wages on some projects drive down wages more widely, the negative economic impact is more severe. Workers have less income to support themselves and their family, to make purchases and engage in other job-creating economic activity, and governments collect less in sales, income, and other payroll taxes.

When only some employers within an industry take advantage of an overtime exemption, it begins a race to the bottom at the expense of employees.

---

[14] U.S. Bureau of Labor Statistics, Occupational Outlook Handbook, *Construction Laborers and Helpers*, *https*://www.bls.gov/ooh/construction-and-extraction/construction-laborers-and-helpers.htm (last accessed 12/6/2021).

Exempt agricultural employers can work their employees more and longer hours at straight time wages. As a result, there are two options. Other employers clamber to catch up, which means an equal reduction of employee wages to regain a competitive bidding position for similar work. Alternatively, employers within the construction enjoy an unfair competitive advantage industry take advantage. Either result is untenable and inconsistent with the purpose of the Fair Labor Standards Act and other laws and regulations designed to promote economic stability for the country, states, and workers, alike.

**CONCLUSION**

For the reasons and concerns expressed herein, amicus curiae Wisconsin Building Trades Council respectfully requests the Court to reverse the decision of the district court and remand it for further proceedings.

Respectfully submitted this 7th day of December, 2021.

/s/ Sara J. Geenen
Sara J. Geenen
State Bar No. 1052748
THE PREVIANT LAW FIRM
310 W Wisconsin Ave, Suite 100MW
Milwaukee, WI 53203
414-223-0402 (direct)
414-271-6308 (fax)
sjg@previant.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION, TYPEFACE REQUIREMENTS, ANY TYPE STYLE REQUIREMENTS

I hereby certify that:

1.      This brief complies with Federal Rules of Appellate Procedure 27(d) and 32(a)(7) because it contains 3,826 words, excluding the parts exempted by Federal Rules of Appellate Procedure 32(f), as counted by a word processing system and, therefore, is within any applicable word limit.

2.      This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and Circuit Rule 32 because it has been prepared in 13 point, proportionally spaced typeface (Century Schoolbook).

<u>/s/ Sara J. Geenen</u>

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of December, 2021, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court of the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Sara J. Geenen