No. 21-2644

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

Jose Ageo LUNA VANEGAS

*Plaintiff-Appellant*

v.

SIGNET BUILDERS, INC.

*Defendant-Appellee*

**Appeal from the U.S. District Court for the Western District of Wisconsin**

Case No. 3:21-cv-00054-jdp

---

**BRIEF OF AG INSTALLERS, INC., ALEWELT CONCRETE, INC., ALTENBURG CONSTRUCTION, INC., LIONHEART CONSTRUCTION LLC, SUMMIT LIVESTOCK FACILITIES LLC, d/b/a SUMMIT ENGINEERING AND CONSTRUCTION, AND SUMMIT HEARTLAND, LLC AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE SIGNET BUILDERS, INC.**

---

Nowell Berreth
Kristi Boswell
Terance A. Gonsalves
    *Counsel of Record*
Fiona O'Carroll

**ALSTON & BIRD LLP**
1201 West Peachtree Street NW
Atlanta, Georgia 30309
Tel: 404-881-7000
Fax: 404-881-7700
nowell.berreth@alston.com
kristi.boswell@alston.com
terance.gonsalves@alston.com
fiona.ocarroll@alston.com

*Counsel for Amici Curiae*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2644

Short Caption: Jose Ageo Luna Vanegas v. Signet Builders, Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Ag Installers, Inc., Alewelt Concrete, Inc., Altenburg Construction, Inc., Lionheart Construction LLC, Summit Livestock

Facilities LLC, d/b/a Summit Engineering and Construction, and Summit Heartland, LLC

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Alston & Bird LLP for Amici Curiae

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        Bahler Holdings, LLC is the parent company of the two Summit entities.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Nowell D. Berreth    Date: February 10, 2022

Attorney's Printed Name: Nowell D. Berreth

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☐

Address: 1201 West Peachtree Street

Atlanta, GA  30309-3424

Phone Number: 404-881-7000    Fax Number: 404-881-7777

E-Mail Address: nowell.berreth@alston.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>21-2644</u>

Short Caption: <u>Jose Ageo Luna Vanegas v. Signet Builders, Inc.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    <u>Ag Installers, Inc., Alewelt Concrete, Inc., Altenburg Construction, Inc., Lionheart Construction LLC, Summit Livestock</u>

    <u>Facilities LLC, d/b/a Summit Engineering and Construction, and Summit Heartland, LLC</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    <u>Alston & Bird LLP for Amici Curiae</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>Bahler Holdings, LLC is the parent company of the two Summit entities.</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Kristi J. Boswell</u>    Date: <u>February 10, 2022</u>

Attorney's Printed Name: <u>Kristi J. Boswell</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☐

Address: <u>The Atlantic Building, 950 F Street, NW</u>

    <u>Washington, DC  20004-1404</u>

Phone Number: <u>202-239-3300</u>    Fax Number: <u>202-239-3333</u>

E-Mail Address: <u>kristi.boswell@alston.com</u>

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-2644

Short Caption: Jose Ageo Luna Vanegas v. Signet Builders, Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Ag Installers, Inc., Alewelt Concrete, Inc. Altenburg Construction, Inc., Lionheart Construction LLC, Summit Livestock

    Facilities LLC, d/b/a Summit Engineering and Construction, and Summit Heartland, LLC

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Alston & Bird LLP for Amici Curiae

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        Bahler Holdings, LLC is the parent company of the two Summit entities.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Terance A. Gonsalves    Date: February 10, 2022

Attorney's Printed Name: Terance A. Gonsalves

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑    **No** ☐

Address: 1201 West Peachtree Street

    Atlanta, GA 30309-3424

Phone Number: 404-881-7000    Fax Number: 404-881-7777

E-Mail Address: terance.gonsalves@alston.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>21-2644</u>

Short Caption: <u>Jose Ageo Luna Vanegas v. Signet Builders, Inc.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Ag Installers, Inc., Alewelt Concrete, Inc., Altenburg Construction, Inc., Lionheart Construction LLC, Summit Livestock</u>

    <u>Facilities LLC, d/b/a Summit Engineering and Construction, and Summit Heartland, LLC</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Alston & Bird LLP for Amici Curiae</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>Bahler Holdings, LLC is the parent company of the two Summit entities.</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Fiona P. O'Carroll</u>    Date: <u>February 10, 2022</u>

Attorney's Printed Name: <u>Fiona P. O'Carroll</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☐

Address: <u>1201 West Peachtree Street</u>

        <u>Atlanta, GA  30309-3424</u>

Phone Number: <u>404-881-7000</u>    Fax Number: <u>404-881-7777</u>

E-Mail Address: <u>fiona.ocarroll@alston.com</u>

# TABLE OF CONTENTS

**Page**

**INTEREST OF *AMICI CURIAE***....................................................................1

**BACKGROUND ON THE H-2A VISA PROGRAM**..................................5

I.    "Agricultural Labor or Services" ............................................................6

II.    Overview of Requirements for Employers...........................................7

III.    Increasing Need for H-2A Labor ........................................................10

**ARGUMENT** ..................................................................................................11

I.    The construction and repair of livestock confinement structures on farms is "agriculture." ..........................................................................12

    A.    The construction of farm buildings is an intuitive example of secondary agriculture, as defined by Section 203(f) of the FLSA..............................................................................................12

    B.    Workers who construct livestock confinement structures are analogous to the railroad workers in *Maneja*. .......................16

    C.    The fact that some livestock confinement structures feature innovations such as automation and climate control does not remove construction of such structures from the secondary agriculture exemption. ..........................................................17

II.    The DOL's determination that agricultural construction is "agriculture" is entitled to deference. ..................................................18

III.    A holding that the construction of livestock confinement structures is not "agriculture" within the meaning of the FLSA could impact agricultural construction companies who rely on the H-2A visa program. ..................................................................................................21

**CONCLUSION** .............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AFL-CIO v. Dole*,
923 F.2d 182 (D.C. Cir. 1991) ................................................................5

*Farmers Res. & Irrig. Co. v. McComb*,
337 U.S. 755 (1949) ...........................................................................13, 15

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
563 U.S. 1 (2011) ...................................................................................19

*Maneja v. Waialua Agric. Co.*,
349 U.S. 254 (1955) ............................................................12, 16, 17, 18

*NLRB v. Monterey County Building & Construction Trades Council*,
335 F.2d 927 (9th Cir. 1964) .................................................................12

*Sariol v. Fla. Crystals Corp.*,
490 F.3d 1277 (11th Cir. 2007) .............................................................15

*Skidmore v. Swift & Co.*
323 U.S. 134 (1944) ...................................................................19, 20, 21

**STATUTES**

8 U.S.C. § 1101 ............................................................................6, 7, 13, 20

8 U.S.C. § 1188 ..................................................................................................9

26 U.S.C. § 3121 ...............................................................................................7

29 U.S.C. § 203 .......................................................................................*passim*

**REGULATIONS**

29 C.F.R. § 780.6 ...........................................................................................20

29 C.F.R. § 780.7 ...........................................................................................20

29 C.F.R. § 780.100 .......................................................................................20

29 C.F.R. § 780.136 ........................................................................12, 15, 21

29 C.F.R. § 780.144 ................................................................12

29 C.F.R. § 780.203 ...........................................................12, 21

**OTHER AUTHORITIES**

*Cash Receipts by Commodity State Ranking*, Econ. Rsch. Serv. U.S. Dep't
of Agric. (last visited Feb. 6, 2022) ............................................25

David J. Bier, *H-2A Visas for Agriculture: The Complex Process for
Farmers to Hire Agricultural Guest Workers* (Mar. 10, 2020) ...................10

*FAQs*, Econ. Rsch. Serv. U.S. Dep't of Agric. (last visited Feb. 6, 2022) ...................24

Grace Dean & Heather Schlitz, *The construction industry needs a
'staggering' 2.2 million more workers to keep up with booming demand
for houses amid the labor shortage* (Business Insider Nov. 5, 2021)........................24

Josh Mitchell, Lauren Weber, & Sarah Chaney Cambon, *4.3 Million
Workers Are Missing. Where Did They Go?* (Wall Street Journal Oct.
14, 2021) ...............................................................................23

NPR, *Millions of Pigs Will Be Euthanized As Pandemic Cripples
Meatpacking Plants* (May 14, 2020)................................................14

Senate Judiciary Committee Report on the Immigration Reform &
Control Act of 1985, S. Rep. No. 99-132 (1985) ..........................................5

Skyler Simnitt & Marcelo Castillo, *Use of H-2A Guest Farm Worker
Program More Than Triples in Past Decade,* Econ. Rsch. Serv. U.S.
Dep't of Agric. (Sept. 7, 2021) ...............................................10, 23

Steven Zahniser, J. Edward Taylor, Thomas Hertz, & Diane Charlton,
*Farm Labor Markets in the United States and Mexico Pose Challenges
for U.S. Agriculture* (Nov. 2018) ...........................................10, 23

Thaddeus Swanek, *New Report Finds Construction Contractors
Struggling to Find Workers, Building Materials* (June 16, 2021) .............................24

U.S. Chamber of Commerce, *The America Works Report: Quantifying
the Nation's Workforce Crisis* (June 1, 2021) .............................................23

U.S. Citizenship & Immigration Services, *H-2B Cap Reached for Second
Half of FY2020* (Feb. 26, 2020) .........................................................6

U.S. Dep't of Labor, Employment and Training Administration, *H-2A
Temporary Agricultural Program* ...................................................................................8

U.S. Dep't of Labor, *U.S. Department of Labor Announces Final Rule to
Modernize and Improve the Recruitment of American Workers for
Temporary Agricultural Jobs* (Sept. 20, 2019) ............................................................8

U.S. Dep't of State, *Nonimmigrant Visas Issued by Classification, Fiscal
Years 2016-2020* ...........................................................................................................6

## INTEREST OF *AMICI CURIAE*

*Amici curiae* Ag Installers, Inc., Alewelt Concrete, Inc., Altenburg Construction, Inc., Lionheart Construction LLC, Summit Livestock Facilities LLC, d/b/a Summit Engineering and Construction, and Summit Heartland, LLC (collectively, "*Amici*") submit this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) after having obtained the consent of all parties.[1]

In this litigation, Plaintiff contends that he and other H-2A workers who construct livestock confinement structures are entitled to overtime under the Fair Labor Standards Act ("FLSA"). Although the FLSA exempts "agriculture" from overtime requirements, Plaintiff maintains that the construction of a livestock confinement facility on a farm does not constitute "agriculture" within the meaning of the FSLA. Thus, the central question in this case is whether the construction of livestock confinement facilities on farms is "agriculture" under the FLSA.

The ramifications of the Court's answer go beyond the immediate issue of overtime, however. *Amici* submit this brief to explain that the Court's statutory analysis may have significant implications for the H-2A visa program. An employer can hire temporary or seasonal guest workers through the H-2A visa program only for "agricultural labor or services." The H-2A definition of "agricultural labor or services" is tied to the FLSA definition of "agriculture." The Court's decision in this

---

[1] In accordance with Fed. R. App. P. 29(a)(4)(E), *Amici* state that no party or party's counsel authored this brief in whole or in part, and no party or party's counsel made a monetary contribution to fund the preparation or submission of this brief. No person other than *Amici* contributed any money to the preparation and submission of this brief.

matter is therefore of great importance to *Amici*, who rely on the H-2A program as an essential source of labor for farm construction.

*Amici* are companies that specialize in agricultural construction on farms. **Ag Installers, Inc.** installs aviary equipment for cage-free egg facilities. The equipment serves as an all-metal habitat for chickens, complete with mesh flooring, ramps, feed troughs, water lines, a manure belt, ventilation, fans, inlets, and heaters. Founded in 2015, Ag Installers has advertised hundreds of labor positions in its history in various states and attempted to hire all U.S. workers who expressed interest. But Ag Installers has found it impossible to fill even a small percentage of its labor needs by hiring U.S. workers. It therefore relies on the H-2A visa program, currently working with about a hundred H-2A workers per year. Ag Installers likely would not be in business anymore but for the H-2A visa program.

**Alewelt Concrete** is a concrete subcontractor that has worked in the agriculture industry since 1999. It works on farms throughout the Midwest, providing concrete construction for livestock structures. The majority of Alewelt's work is for the pork industry, but it also constructs dairy and cattle barns and cage-free egg facilities. Alewelt prides itself on participating in the construction of modern buildings that support higher animal welfare standards—buildings that have sufficient square footage per animal, with climate control, good ventilation, filtration systems to reduce odor, and regular misting. Alewelt employs several hundred H-2A workers per year.

**Altenburg Construction** is a family business specializing in hog slat & cattle slat replacement, with most of its work on hog farms. In business since 1994 and capable of travelling to fourteen States across the Midwest, Altenburg responds to emergency calls for repairs and works with growers on strategic planning for the future by identifying barns that will need repair. The equipment that Altenburg uses in working on concrete, metal, and plastic flooring in barns is highly specialized and can be dangerous. As an additional challenge, the inflexible timetables inherent to hog farming—with a cycle known in the industry as the "turn of pigs"—mean that Altenburg cannot afford any delay or disruption in completing repair jobs. For these reasons, a reliable agricultural construction workforce is crucial to Altenburg's operations. Altenburg anticipates that it will bring in several dozen H-2A workers this year.

**Lionheart Construction**, a sole proprietorship, specializes in poultry house construction, primarily serving Georgia and South Carolina. For Lionheart, everything is driven by "bird dates": when the pullets are ready, when the eggs are laid, when the broilers are ready to go out. Lionheart contracts directly with individual farmers, tailoring its construction projects to farmers' needs and meeting their time schedules for completion. In addition to poultry houses, Lionheart builds stack houses for holding chicken litter and can also build small or large barns. In establishing Lionheart, sole proprietor Julia Lunn was going back to her roots. Ms. Lunn grew up in the middle of southern Indiana farm country, where her family raised swine from farrow to feeder, grew corn and soybeans, and ran her

3

grandfather's cattle farm. H-2A workers currently make up the vast majority of Lionheart's construction workforce. Ms. Lunn estimates that Lionheart might have closed its doors by now had it not been for the H-2A program.

**Summit Livestock Facilities LLC**, which does business as Summit Engineering and Construction ("Summit Livestock Facilities"), is a general contractor specializing in the erection of livestock facilities, including poultry, dairy, and aquaculture facilities. It works in various states across the country and has been in business since 2012. **Summit Heartland LLC** is a general contractor specializing in the erection of swine production facilities, including finishers, farrowing, and nurseries. Established in 1988 and acquired by Summit Livestock Facilities in 2016, Summit Heartland works primarily in the Midwest region, but also works in Missouri, Arkansas, Texas, and Oklahoma. Both Summit entities rely on subcontractors for the performance of their projects, and the majority of their subcontractors use the H-2A program as a labor source. Both entities have large-scale jobs in rural areas in which there is only a temporary need for a labor force. The H-2A program enables short-term construction needs in these areas to be met quickly, whereas without the workforce certified under this program, the other workforce in those areas would not be able to sustain the speed and scale of the Summit entities' projects.

All of these companies are intimately familiar with the nature of agricultural construction work. They have many years of specialized experience in building livestock structures that are integral to farmers' operations—and crucial to farmers'

4

success. They know firsthand that it has been increasingly difficult—to the point of impossible—to recruit domestic workers for the rural jobs that farmers need done. Accordingly, they rely heavily on the H-2A visa program as a matter of necessity.

The DOL's longstanding classification of farm construction as "agricultural labor or services" allows *Amici* to participate in the H-2A visa program. *Amici* respectfully submit that holding that the construction of livestock confinement facilities is not within the FLSA definition of "agriculture" would be legally erroneous and could jeopardize the agricultural construction industry's access to a crucial source of labor. In turn, it could impact the farming operations they support.

## BACKGROUND ON THE H-2A VISA PROGRAM

The H-2A visa program has its origins in the Immigration and Naturalization Act of 1952 ("INA"), which regulated foreign agricultural workers. In 1986, the Immigration Reform and Control Act ("IRCA") amended the INA to separate the pre-existing H-2 visa program into H-2A for agricultural workers and H-2B for non-agricultural workers. A central purpose of the H-2A program was and is to provide a legal channel for employers to hire foreign agricultural workers. *See, e.g., AFL-CIO v. Dole*, 923 F.2d 182, 184 (D.C. Cir. 1991) (noting that IRCA "was primarily designed to reduce illegal immigration"); Senate Judiciary Committee Report on the Immigration Reform & Control Act of 1985, S. REP. No. 99-132, at 2 (1985) (H-2 program revised "to assist agricultural employers in adjusting to the reduced availability of illegal foreign workers"). Today, the H-2A visa program is a highly

regulated program administered by the DOL, U.S. Citizenship and Immigration Services ("USCIS"), and the State Department.

The H-2A program, unlike the H-2B program, does not have a statutory annual cap. In a typical year, the annual cap for H-2B workers is 66,000, and there are more applications for the H-2B program than there are openings. *See, e.g.*, USCIS, *H-2B Cap Reached for Second Half of FY2020* (Feb. 26, 2020) (https://www.uscis.gov/news/alerts/h-2b-cap-reached-for-second-half-of-fy2020). In recent years, the number of H-2A visas issued per year far exceeds the H-2B cap. For example, 213,394 H-2A visas were issued in 2020 alone. U.S. Dep't of State, *Nonimmigrant Visas Issued by Classification, Fiscal Years 2016-2020* (https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2020 AnnualReport/FY20AnnualReport-TableXVB.pdf). An additional challenge associated with the H-2B program is the requirement of establishing an existing work need. If a customer commitment or project start date does not coincide with the period when the H-2B cap is opened, the company may be unable to obtain an H-2B visa for the project after having committed to completing it.

## I.    "Agricultural Labor or Services"

The H-2A program enables employers who anticipate a lack of available domestic workers to hire foreign workers to come to the United States for temporary or seasonal "agricultural labor or services." 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Under the H-2A statute, "agricultural labor or services" is defined to include "agriculture as defined in section 203(f) of title 29 [the FLSA]." *Id.*

6

The question in this case is whether farm construction constitutes "agriculture" within the meaning of Section 203(f) of the FLSA—specifically, whether it constitutes the sub-category of "secondary agriculture."[2] The FLSA defines "agriculture" as follows:

> "Agriculture" includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) [2] of title 12), the raising of livestock, bees, fur-bearing animals, or poultry, ***and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market***.

29 U.S. Code § 203(f) (emphasis added to indicate definition of "secondary agriculture"). The FLSA's inclusion of secondary agriculture shows that Congress clearly understood the need to expand "agricultural labor or services" beyond primary agricultural activities.[3]

## II.     Overview of Requirements for Employers

As detailed in Signet's brief, an employer begins the H-2A visa application process by filing form ETA 790 with the appropriate State Workforce Agency. The employer then files an application for a temporary labor certification with the DOL.

---

[2] The parties agree that farm construction does not constitute "primary agriculture." Case No. 3:21-cv-00054-jdp, Doc. 52 at 3.

[3] Although the definition of "agricultural labor or services" in 8 U.S.C. § 1101(a)(15)(H)(ii)(a) also encompasses "agriculture as defined in section 3121(g) of title 26," it is unclear whether such definition applies to secondary agriculture such as the construction of livestock confinement structures.

*See generally* U.S. Dep't of Labor, Employment and Training Administration, *H-2A Temporary Agricultural Program* (https://www.dol.gov/agencies/eta/foreign-labor/programs/h-2a) (last visited Feb. 10, 2022).

Additionally, the employer must engage in positive recruitment by advertising the job to U.S. workers. The employer must submit a job order to their State Workforce Agency outlining the terms and conditions of the employment. The State Workforce Agency then facilitates domestic recruitment by posting the job order and conducting outreach activities. Until 2019, employers were required to place ads in newspapers. A new rule provides for online advertisement instead. Now, the DOL advertises all H-2A job opportunities by posting them on SeasonalJobs.dol.gov, an electronic job registry. *See* U.S. Dep't of Labor, *U.S. Department of Labor Announces Final Rule to Modernize and Improve the Recruitment of American Workers for Temporary Agricultural Jobs* (Sept. 20, 2019) (https://www.dol.gov/newsroom/releases/eta/eta20190920).

The employer must accept eligible referrals of U.S. workers who apply for the job and hire any who are minimally qualified, and must contact any former U.S. employees at their last known contact address. If a domestic worker is available for the job, the employer cannot hire an H-2A worker for that job. What is more, if an eligible U.S. worker applies for the job between the start date and the half-way point, the employer must hire the U.S. applicant despite the H-2A worker having already filled that available job opportunity.

A Certifying Officer in the Office of Foreign Labor Certification reviews an employer's application for a temporary labor certification and determines whether the employer's job opportunity qualifies as "agricultural." The Certifying Officer also determines, in accordance with 8 U.S.C. § 1188(a)(1) and 20 C.F.R. § 655 Subpart B, that a sufficient number of able, willing, and qualified U.S. workers have not been identified as available at the time and place needed to fill the job opportunities, and that employment of the H-2A workers will not adversely affect the wages and working conditions of similarly employed workers in the United States.

Once the DOL's temporary labor certification process is complete, the employer files form I-129 with USCIS. If USCIS authorizes the issuance of an H-2A visa, each individual worker then files an H-2A visa application with the State Department. Ultimately, each worker will enter the United States on an H-2A visa and, at the expiration of the approved work period, leave the United States.

The H-2A program imposes substantial financial costs on employers. The employer must pay all the fees associated with filing a visa application and must provide housing, transportation, and cooking facilities or three meals per day for its H-2A workers after they arrive in the U.S. and its non-local U.S. workers.[4] In addition, an employer of H-2A workers has wage requirements for each state that are determined by the Adverse Effect Wage Rate ("AEWR"), which is typically

---

[4] The rise of farm labor contractors ("FLCs") is a factor of the bureaucratic complexity and financial costs of the H-2A program, which can be spread with the economies of scale by FLCs, thereby making the program more feasible for a FLC than for a fixed-site employer.

9

higher than the state's minimum wage. *See* David J. Bier, *H-2A Visas for Agriculture: The Complex Process for Farmers to Hire Agricultural Guest Workers* (Mar. 10, 2020) (https://www.cato.org/publications/immigration-research-policy-brief/h-2a-visas-agriculture-complex-process-farmers-hire#h-2a-program-rules) (noting that 2020 AEWR was higher than every state's minimum wage by average of 57 percent).

### III.    Increasing Need for H-2A Labor

The past decade has witnessed a steady increase in the number of H-2A workers arriving each year. *See* Skyler Simnitt & Marcelo Castillo, *Use of H-2A Guest Farm Worker Program More Than Triples in Past Decade*, Econ. Rsch. Serv. U.S. Dep't of Agric. (Sept. 7, 2021) (https://www.ers.usda.gov/amber-waves/2021/september/use-of-h-2a-guest-farm-worker-program-more-than-triples-in-past-decade/). The increase attests to the tightening labor market in the United States. *Id.*; *see also* Steven Zahniser, J. Edward Taylor, Thomas Hertz, & Diane Charlton, *Farm Labor Markets in the United States and Mexico Pose Challenges for U.S. Agriculture* (Nov. 2018) (https://www.ers.usda.gov/webdocs/publications/90832/eib201_summary.pdf?v=922).

Ag Installers, Alewelt Concrete, Altenburg Construction, Lionheart Construction, Summit Livestock Facilities, and Summit Heartland have all experienced the increasing difficulty of recruiting a rural workforce domestically. As of the past five years or so, it has become extremely difficult for these companies to fill their labor needs without hiring H-2A workers. As explained further below, the remote nature of the work, which necessitates travelling to farms in rural areas,

appears to appeal to fewer and fewer U.S. workers. *Amici* have therefore had to turn to the H-2A program, incurring the attendant costs, audits, and complexity, because they need a reliable agricultural construction workforce.

## ARGUMENT

Here, the District Court correctly determined, as a matter of law, that the construction of a livestock confinement structure on a farm is "agriculture" under Section 203(f) of the FLSA. *Amici* respectfully submit that a contrary holding in this appeal would be legally erroneous and could jeopardize a crucial source of labor for the agricultural construction industry, potentially harming business such as *Amici*, the farmers that *Amici* support, and meat production in the United States.

With regard to the law, the construction of livestock structures on farms is clearly "agriculture" under the proper legal test. As Signet explained in its brief, it is the nature, location, and purpose of the practice which is dispositive—not the nature of the employer's overall business. Further, the classification of farm construction as "agriculture" reflects a persuasive, longstanding, and consistent view of the DOL—the agency charged with defining "agricultural labor or services" and administering the FLSA. That classification is therefore entitled to deference.

As a matter of real-world impact, because the FLSA definition of "agriculture" informs the H-2A definition of "agricultural labor or services," the Court's ruling could impact the ability of companies like *Amici* to participate in the H-2A visa program.

I.    **The construction and repair of livestock confinement structures on farms is "agriculture."**

A.    **The construction of farm buildings is an intuitive example of secondary agriculture, as defined by Section 203(f) of the FLSA.**

The FLSA's agricultural exemption was intended to "embrace the whole field of agriculture." *Maneja v. Waialua Agric. Co.*, 349 U.S. 254, 260 (1955). As such, it includes not only primary farming activities like planting seeds and caring for livestock, but also secondary agriculture: "practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations." 29 U.S.C. § 203(f). By way of illustration, secondary agriculture can include "the preparation of timber for construction of [a farmer's] farm buildings" (29 C.F.R. § 780.203) and the "erection of silos and granaries" (29 C.F.R. § 780.136) when performed on a farm by independent contractors.

Although "[t]he line between practices that are and those that are not performed 'as an incident to or in conjunction with' such farming operations is not susceptible of precise definition" (29 C.F.R. § 780.144), the construction of livestock confinement structures on farms is not a borderline case. Rather, it sits squarely—intuitively—within secondary agriculture. No court applying the proper test has concluded otherwise.[5]

---

[5] In *NLRB v. Monterey County Building & Construction Trades Council*, the Ninth Circuit applied an improper test inasmuch as it focused on the corporate organization and overall business of the employers, rather than the nature, location, and purpose of the practice itself. 335 F.2d 927, 931 (9th Cir. 1964) (focusing on "the fact that the Whiteside Construction Co. and Buckeye Incubator Company are organized separately from any farming or poultry operation and are engaged in a productive activity which is independent from any farming or poultry operations," and granting NRLB's petition for

Here, Plaintiff urges the Court to analyze the issue under *Farmers Reservoir* by asking whether agricultural construction is "part of the agricultural function" or, rather, a "separately organized productive activity." Even under that framework, agricultural construction clearly counts as "agriculture."

Ag Installers, Alewelt Concrete, Altenburg Construction, Lionheart Construction, Summit Livestock Facilities, and Summit Heartland know firsthand what it means to be "part of the agricultural function" of the farmers they work for. *Amici* specialize in constructing, installing, and/or repairing livestock structures that are integral to their farmer customers' farming operations. Their construction practices are driven by the needs and the timing of their customers' farming operations. And the structures they build or repair are vital to the welfare of their customers' animals.

Take Altenburg Construction, for example. Altenburg specializes in repairing hog slats, which is the flooring that hogs stand on that allows manure to drop to a level below. Informed by long experience with pork production, Altenburg's work is dictated by the "turn of pigs." In commercial hog farming, the turn of pigs refers to a strict schedule based on the hog's life cycle. The first phase is gestation and farrowing. At 21 days old, the pig is either transferred to a nursery,

---

enforcement based on deferential standard of review). In any event, to the extent that the NLRB's view may differ from the DOL's view, the Court should defer to the DOL's view instead. As discussed below, the DOL's view is expressed in longstanding interpretive regulations and consistent rulings on applications for temporary labor certifications. The H-2A statute expressly contemplates that the Secretary of Labor (not the NLRB) will define what "agricultural labor or services" means. 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

where it becomes a feeder pig after four months, or it is transferred to a grow site where it is slaughtered after six months. Any disruption or delay in that schedule can be disastrous. For instance, a pork producer might suddenly have to house twice as many animals as expected. When pork producers are unable to properly turn their pigs, they sometimes have to euthanize entire herds of pigs. That is what happened during the pandemic, when meatpacking plants shut down and pigs were not able to be processed according to schedule. *See* NPR, *Millions of Pigs Will Be Euthanized As Pandemic Cripples Meatpacking Plants* (May 14, 2020) (https://www.npr.org/2020/05/14/855662494/millions-of-pigs-will-be-euthanized-as-pandemic-cripples-meatpacking-plants). Altenburg serves farmers by ramping up quickly and reliably on schedule, so as not to disrupt the turn of pigs. Sometimes it has a matter of days or even a single day in which to clean and perform repairs between a group of pigs leaving and the next group coming in due to the finely tuned sequence of pork production. Altenburg needs a reliable workforce in order to get the job done within that tight timeframe. Its work is unquestionably "part of the agricultural function" of the farmer.

So, too, is Lionheart Construction's construction of poultry houses, which is driven by "bird dates" and the needs of individual farmers. So too, is the Summit entities' erection of livestock production facilities, including poultry, dairy, aquaculture, and swine. And so, too, is Ag Installers' installation of poultry equipment for cage-free chickens, including the mesh flooring, feed bins, manure belts, heaters, water lines, and ventilation. What these companies do is critical to the

14

animals' care. The livestock being raised are dependent on what these companies build, install, and repair. As these examples make clear, the construction of any livestock confinement facility on a farm for that farm's activity of raising livestock is "an incident to or in conjunction with such farming operations." 29 U.S.C. § 203(f).

Plaintiff suggests that farm construction is not agriculture if it is performed by employees of an independent contractor. But that is not the law. Plaintiff relies heavily on the dicta in *Farmers Reservoir* regarding "separately organized" "independent productive activities." Although that language is not self-evidently clear, one thing it ***cannot*** mean is that work by an independent contractor is outside the scope of "agriculture." *See* 29 U.S.C. § 203(f) ("or on a farm"); 29 CFR § 780.136 (providing "examples of the types of employees of independent contractors who may be considered employed in practices performed 'on a farm'"); *Sariol v. Fla. Crystals Corp.*, 490 F.3d 1277 (11th Cir. 2007) (rejecting argument that independent contractors are "separately organized as an independent productive activity," endorsing instead "the commonsense view that independent contractors do not make up their own separate operations"). Rather, in *Farmers Reservoir*, the Supreme Court seems to have been contemplating off-the-farm activities, including industrial activities such as "the maintenance man in a power plant and the packer in a fertilizer factory." *Farmers Res. & Irrig. Co. v. McComb*, 337 U.S. 755, 763 (1949). Such activities stand in contrast to farm construction on a farm.

**B.**     **Workers who construct livestock confinement structures are analogous to the railroad workers in *Maneja*.**

In the decade after *Farmers Reservoir*, the Supreme Court decided *Maneja v. Waialua Agricultural Co.*, which involved a sugar plantation in Hawaii. 349 U.S. at 256. The Supreme Court considered whether several categories of plantation workers were within the FLSA's agriculture exemption. Most significant for our purposes, the Supreme Court held that the agriculture exemption applied to employees who operated and repaired a railroad on the plantation. The Court reasoned:

> The railroad is used exclusively for the effectuation of the agricultural function of transporting exempt agricultural workers to the fields, together with their equipment and supplies, and hauling freshly cut cane to the processing plant. Without it or some other "haul," the land could not be cultivated and the cane, after harvest, would spoil in the fields and be lost.

*Id*. at 263. Further: "the exemption clearly covers the transportation of farm implements, supplies and field workers to and from the fields" because "this activity is a necessary part of the agricultural enterprise." *Id*. at 262.

As the District Court correctly reasoned, the farm construction workers at issue here are analogous to the railroad workers in *Maneja*. **First**, farm construction workers, like the railroad workers, perform work that is not primary agriculture. *See id*. at 262. **Second**, both cases involve a task that is antecedent to and in preparation for the primary-agriculture activity—here, constructing structures in which to raise livestock; in *Maneja*, transporting field workers to the field. **Third**, in both instances, the work is necessary to the traditional farming activity. In *Maneja*,

the Court emphasized that, without the railroad or some other haul, the land could not be cultivated, and the sugar cane would spoil. *Id.* at 263. Similarly, livestock cannot be properly cared for, protected, and raised for meat, dairy, or egg production without a barn or some other livestock confinement structure. ***Finally***, operating a railroad and constructing modern livestock confinement structures both have an industrial aspect. But that does not take these activities outside the scope of "agriculture" if they are "part of the agricultural venture." *Id.* at 265. As the Supreme Court explained: "If it is agriculture, albeit industrialized and involving highly specialized mechanical tasks, we must hold it to be within the agriculture exemption." *Id.* at 265.

The railroads in *Maneja* were "a necessary part of the agricultural enterprise" of the plantation. 349 U.S. at 263. Likewise, the construction, installation, and repair of livestock confinement structures is "a necessary part of the agricultural enterprise" of the farms where the structures are located. *Id.* Indeed, livestock confinement structures are, if anything, more necessary and more integral to the work of raising livestock than railroads are to sugar plantations.

C.    **The fact that some livestock confinement structures feature innovations such as automation and climate control does not remove construction of such structures from the secondary agriculture exemption.**

*Maneja* also dispenses with the suggestion that the livestock confinement structures at issue are outside the agricultural exemption by virtue of being large,

mechanized, electrified, or otherwise "technologically advanced." Appeal No. 21-
2644, Doc. 25 at 6. In *Maneja*, the Supreme Court explained:

> Nowhere in the [FLSA] was any attempt made to draw a distinction
> between large and small farms or between mechanized and
> nonmechanized agriculture. In view of this, we cannot hold that
> merely because Waialua uses a method ordinarily not associated
> with agriculture -- a railroad -- to transport the cane from the fields
> to the mill, it has forfeited its agriculture exemption. . . .

349 U.S. at 261.

That reasoning makes sense. Treating the degree of modernization as
determinative would be an unworkable rule. It would be impossible for courts (and
for the DOL) to assess each farm construction project to determine whether the barn
to be constructed is so "technologically advanced" that the construction ceases to
be agriculture. Furthermore, such a rule would inappropriately penalize *Amici* for
constructing modern buildings or otherwise implementing innovations. Such
innovations promote sanitary conditions and animal welfare, and may even be
required under animal welfare laws.

Ultimately, the construction of a modern livestock confinement structure
serves the same purpose as an old-fashioned barn, even if that livestock
confinement structure features 21st-century ventilation, mechanized poultry
equipment, and/or climate control.

## II.    The DOL's determination that agricultural construction is "agriculture" is entitled to deference.

Although this lawsuit is not a direct appeal of an agency determination, it
effectively challenges the DOL's certification of Plaintiff's job as "agricultural."

Plaintiff alleges in the Complaint that he was admitted to the United States under the H-2A temporary foreign worker visa program administered by the DOL. Compl. ¶ 8. The labor was to be performed "[o]n farms," with the workers employed to "unload materials, lay out lumber, tin sheets, trusses, and other components for building livestock confinement structures. Lift tin sheets to roof and sheet walls, install doors, and caulk structure. Clean up job sites. Occasional use of forklift upon employer provided certification." *Id.*

The DOL's certification for this job reflects its view—expressed in longstanding interpretive regulations and repeated rulings on applications for temporary labor certifications—that agricultural construction is agriculture. Accordingly, the doctrine of judicial deference to administrative action further supports affirming the District Court's ruling.

Specifically, the DOL's classification of agricultural construction as agriculture is entitled to *Skidmore* deference. In *Skidmore v. Swift & Co.*, the Supreme Court explained that

> the rulings, interpretations and opinions of the Administrator under [the FLSA], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

323 U.S. 134, 140 (1944).

Here, the DOL's interpretive regulations in 29 C.F.R. Part 780 are comparable to the "interpretative bulletin" in *Skidmore*. *Id*. at 138. Indeed, the regulations expressly contemplate serving the purposes discussed in *Skidmore*. *See* 29 C.F.R. §§ 780.6, 780.7, 780.100. Additionally, the DOL's temporary labor certifications of agricultural construction jobs such Plaintiff's—of which there are hundreds if not thousands—are the sort of "informal rulings" that merit the application of *Skidmore* deference. 323 U.S. at 138; *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 15 (2011) (giving weight to Secretary of Labor's interpretation of FLSA under *Skidmore*, finding it reasonable, consistent with FLSA, and consistently held by DOL).

The *Skidmore* factors are all met here. **First**, the thoroughness of the DOL's consideration of the statutory definition of agriculture cannot be doubted. It is evident from the extensive and detailed discussion of each aspect of the definition, and the illustrative scenarios, in the DOL's interpretive regulations. *See* 29 C.F.R. Part 780. These regulations fulfill DOL's mandate under the H-2A statute to define what "agricultural labor or services" means. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a) ("agricultural labor or services, as defined by the Secretary of Labor in regulations").

**Second**, the DOL's view that agricultural construction on farms is agriculture rests on sound reasoning. For the reasons explained above, in the District Court's opinion, and in Signet's brief on appeal, the DOL's view has "power to persuade."

**Third**, the DOL's classification of Mr. Luna Vanegas' job as secondary agriculture is consistent with its earlier pronouncements. As noted above, the DOL

regulations contemplate "the preparation of timber for construction of [a farmer's] farm buildings" (29 C.F.R. § 780.203) and the "erection of silos and granaries" (29 C.F.R. § 780.136) as secondary agriculture. Both those examples date back to the 1941 Wage and Hour Manual. *See* Case No. 3:21-cv-00054-jdp, Doc. 29-1 at 20 ("employees erecting a silo on a farm"); *id.* at 31 ("the preparation of timber for construction of his farm buildings"). To *Amici*'s knowledge, the DOL has been equally consistent in issuing temporary labor certifications for agricultural construction jobs.[6]

In short, the DOL's classification of agricultural construction is within the agency's area of expertise and supported by persuasive reasoning as well as consistent practice. As such, it is entitled to be given weight under *Skidmore*.

**III.    A holding that the construction of livestock confinement structures is not "agriculture" within the meaning of the FLSA could impact agricultural construction companies who rely on the H-2A visa program.**

As discussed above, the Court's ruling on the FLSA exemption issue in this case could have implications for the H-2A visa program. Agricultural construction companies such as *Amici* rely on the H-2A program as a necessary source of labor.

Agricultural construction work is needed in remote rural locations. It is manual labor that requires long journeys and time away from family—a hard lifestyle that seems to appeal to fewer and fewer U.S. workers. The principals of Ag

---

[6] Although *Amici* are aware of one inconsistent ruling in 2008 with respect to Alewelt's construction of livestock confinement structures, the DOL corrected its error: it stipulated that the work activity was agricultural employment. *See* Appeal No. 21-2644, Doc. No. 34 at 84.

Installers, Alewelt Concrete, Altenburg Construction, Lionheart Construction, Summit Livestock Facilities, and Summit Heartland recall a time when it was easier, if not exactly easy, to find U.S. workers for rural jobs. A principal of Alewelt, for example, recalls his father encouraging him to be willing to "drive to the work"— an ethic that seems less common today. An Altenburg co-owner recalls that, in the 1990s, it was relatively easy to attract local people with knowledge and experience. But that has changed. Altenburg has spent thousands of dollars of advertising in newspapers and online platforms. In recent years, it is rare for Altenburg to get anyone to apply, and ever rarer to get someone who is qualified.

Similarly, Ag Installers advertised hundreds of labor positions in various states between 2015, when it started up, and 2019, when the company's founder drafted a letter to his local representative regarding the H-2A program. The letter reported that, in Ag Installers' four-year history, it received interest from about 20 U.S. workers, all of which were offered a position. Less than half of that group accepted the position. Of those who accepted, only two stayed until the end of the work contract (and no work contract was more than ten months in length).

Lionheart noticed a similar pattern. The situation seemed to get worse around 2017. It was around that point that sole proprietor Ms. Lunn felt she had no choice but to turn to foreign workers. Lionheart, too, spends money on advertising beyond what is legally required for the H-2A program. But based on its experience, even offering above-market pay would not allow Lionheart to attract enough workers, let alone enough reliable, qualified workers.

22

For Summit Livestock Facilities and Summit Heartland, the H-2A program is crucial for meeting short-term construction needs in the rural areas where they build. The current labor force in the areas where these companies are building would not be able to quickly ramp up as needed based on the speed and scale of the jobs.

The increase in H-2A guest workers in the past decade is an indicator of the overall tightening of the U.S. labor market. Skyler Simnitt & Marcelo Castillo, *Use of H-2A Guest Farm Worker Program More Than Triples in Past Decade*, Econ. Rsch. Serv. U.S. Dep't of Agric. (Sept. 7, 2021); *see also* Steven Zahniser, J. Edward Taylor, Thomas Hertz, & Diane Charlton, *Farm Labor Markets in the United States and Mexico Pose Challenges for U.S. Agriculture* (Nov. 2018).

Furthermore, in recent months, the United States has faced record labor shortages across various industries. *See, e.g.,* Josh Mitchell, Lauren Weber, & Sarah Chaney Cambon, *4.3 Million Workers Are Missing. Where Did They Go?* (Wall Street Journal Oct. 14, 2021) (https://www.wsj.com/articles/labor-shortage-missing-workers-jobs-pay-raises-economy-11634224519); U.S. Chamber of Commerce, *The America Works Report: Quantifying the Nation's Workforce Crisis* (June 1, 2021) (https://www.uschamber.com/workforce/education/the-america-works-report-quantifying-the-nations-workforce-crisis). That includes agriculture and construction (*id*.), although the shortage of agricultural labor is not new to the pandemic. As for construction, a 2021 U.S. Chamber of Commerce survey found that 88 percent of commercial construction contractors reported moderate-to-high

levels of difficulty finding skilled workers, nearly half reported a high level of difficulty, and more than a third had to turn down work because of labor deficiencies. Thaddeus Swanek, *New Report Finds Construction Contractors Struggling to Find Workers, Building Materials* (June 16, 2021) (https://www.uschamber.com/infrastructure/new-report-finds-construction-contractors-struggling-find-workers-building); *see also* Grace Dean & Heather Schlitz, *The construction industry needs a 'staggering' 2.2 million more workers to keep up with booming demand for houses amid the labor shortage* (Business Insider Nov. 5, 2021) (https://www.businessinsider.com/construction-industry-needs-staggering-22m-more-workers-2021-11). Given these conditions, the importance of the H-2A visa program to companies such as *Amici* is starkly apparent.

From a geographic perspective, the potential impact of this case is greatest in areas where animal agriculture is an important industry—which include Illinois, Indiana, and Wisconsin. According to the U.S. Department of Agriculture's Economic Research Service ("ERS"), "[i]n 2020, the top 10 agriculture-producing States in terms of cash receipts were (in descending order): California, Iowa, Nebraska, Texas, Kansas, Minnesota, Illinois, Wisconsin, Indiana, and North Carolina." *FAQs*, Econ. Rsch. Serv. U.S. Dep't of Agric. (https://www.ers.usda.gov/faqs/#:~:text=In%202020%2C%20the%20top%2010,Farm%20Income%20and%20Wealth%20Statistics) (last visited Feb. 6, 2022). State rankings on cash receipts by commodity show that:

- For dairy products, Wisconsin ranks #2 in the nation

- For chicken eggs, Indiana ranks # 3

- For turkeys, Indiana ranks # 3

- For hogs, Illinois ranks #4, Indiana #5, and Wisconsin #16

- For farm chickens, Indiana and Illinois rank in the top 20

*Cash Receipts by Commodity State Ranking*, Econ. Rsch. Serv. U.S. Dep't of Agric.

(https://data.ers.usda.gov/reports.aspx?ID=17844#P9e06edba686446a8bcc171009

0e4ebbf_10_251iT0R0x132) (last visited Feb. 6, 2022).

These facts underscore the significance of the Court's ruling in this case.

## CONCLUSION

The District Court correctly applied the law to the facts as alleged in the

Complaint. For the reasons stated above, *Amici* respectfully urge the Court to affirm.

*/s/ Terance A. Gonsalves*
Nowell Berreth
Kristi Boswell
Terance A. Gonsalves
Fiona O'Carroll

**ALSTON & BIRD LLP**
1201 West Peachtree Street NW
Atlanta, Georgia 30309
Tel: 404-881-7000
Fax: 404-881-7700
nowell.berreth@alston.com
kristi.boswell@alston.com
terance.gonsalves@alston.com
fiona.ocarroll@alston.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 29 because this brief contains 6,550 words, excluding the parts of the brief listed in Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Book Antiqua, a proportionally spaced typeface, in 12-point font for the body text and 11-point font for the footnotes.

Dated: February 10, 2022.

*/s/ Terance A. Gonsalves*
Terance A. Gonsalves

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of February, 2022, I caused a true and correct copy of the foregoing **Brief of Ag Installers, Inc., Alewelt Concrete, Inc., Altenburg Construction, Inc., Lionheart Construction LLC, Summit Livestock Facilities LLC, d/b/a Summit Engineering and Construction, and Summit Heartland, LLC as** *Amici Curiae* **in Support of Defendant-Appellee Signet Builders, Inc.** to be electronically filed with the Clerk of the Court of the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to CM/ECF procedure (h)(2) and Circuit Rule 31(b), and upon notice of this court's acceptance of the electronic brief for filing, I certify that I will cause fifteen copies of the foregoing **Brief of Ag Installers, Inc., Alewelt Concrete, Inc., Altenburg Construction, Inc., Lionheart Construction LLC, Summit Livestock Facilities LLC, d/b/a Summit Engineering and Construction, and Summit Heartland, LLC as** *Amici Curiae* **in Support of Defendant-Appellee Signet Builders, Inc.** to be transmitted to the court via UPS overnight delivery, delivery fee prepaid, within seven days, upon the Court's acceptance of the electronic brief.

Dated: February 10, 2022.

/s/ Terance A. Gonsalves
Terance A. Gonsalves